IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SHERRY ROBERTS FLANAGAN, ) | |
| ) | |
|        Plaintiff, ) | |
| ) | |
| v. ) | |
| ) | **Case No.: 7:19-cv-413** |
| PITTSYLVANIA COUNTY, VIRGINIA, ) | |
| et. al. ) | |
| ) | |
|        Defendants. ) | |

## FIRST AMENDED COMPLAINT

COMES NOW, Plaintiff Sherry Roberts Flanagan (hereinafter, "Plaintiff" or "Ms. Flanagan") by counsel, and hereby presents this Amended Complaint against Defendants Pittsylvania County, Virginia (hereinafter, at times, the "County"), Nancy Eanes, Patricia Evans, and Andrea Johnson, in their official capacities as members of the County Department of Social Services ("DSS") Board, Ronald Scearce, in his individual capacity and in his official capacity as a member of the County DSS Board and County Board of Supervisors, Henry Hurt, and William "Vic" Ingram.  In support thereof, Ms. Flanagan provides as follows:

### STATEMENT OF FACTS

1.   In or about May of 2006, Ms. Flanagan, a resident of Stanleytown, Virginia, was hired by the County as a DSS Supervisor.

2.   Pittsylvania County is located within the Commonwealth of Virginia, and governs itself through a seven-member Board of Supervisors ("BOS") elected by the citizenry.

3.   DSS received oversight from, and is supervised by, an eight-member administrative DSS Board ("Local DSS"), which includes one member of the Pittsylvania

County BOS. The DSS Board, in turn, receives oversight from the County BOS. As of December of 2018, the County BOS has seized control of the Local DSS Board.

4.   At all times during her employment with the County, Ms. Flanagan performed her duties faithfully and diligently and, after a series of exemplary work performance reviews, Ms. Flanagan was promoted to DSS Director in 2009 – a position she held until her unlawful termination from employment in August of 2018.

5.   Specifically, Ms. Flanagan was subjected to a stigmatizing and defamatory public smear campaign – orchestrated by BOS member Mr. Scearce, Local DSS Board members Patricia Evans, Nancy Eanes, and Andrea Johnson, Mr. Hurt, and Mr. Ingram, and created in part to rally County community members to advance a political agenda and weaken DSS autonomy and authority – that ultimately resulted in Ms. Flanagan's termination.

6.   Upon information and belief, the plan to defame and terminate Ms. Flanagan commenced in or about January of 2018, when DSS Fraud Investigator Dawn Hankins, and others, purportedly complained of a hostile work environment created by Ms. Flanagan.

7.   Mr. Scearce, Mr. Hurt, and Mr. Ingram worked in concert and mutual agreement in all activities to defame and harm Ms. Flanagan.  Defamatory language published by any of the Defendants, was endorsed by the other Defendants, as shown in paragraph 55 of the Amended Complaint and Exhibit B, *infra*.  The Defendants communicated behind the scenes and worked in concert to harm Ms. Flanagan's reputation and sought her wrongful termination from employment.

8.   In February of 2018, Mr. Scearce, who serves as a liaison to the DSS Board, demanded to meet with former County DSS Board Chairman Rev. Stedman Payne to

discuss Ms. Flanagan, without Ms. Flanagan's knowledge, and began referring to DSS as "persecut[ing]" its employees, stating that "Sherry [Flanagan] . . . is going after people still working at DSS that she believes are a threat", and referring to Ms. Flanagan as a "bully".

9.   None of these inflammatory statements concerning Ms. Flanagan were true.

10. Additionally, on or about February 28, 2018, during the DSS Board's regular meeting, Mr. Scearce openly stated that there were several women claiming Ms. Flanagan created a hostile work environment.

11.   However, Mr. Scearce then called a closed session of the DSS Board outside of the presence of Ms. Flanagan, so that Ms. Flanagan could not present evidence in her defense, or otherwise clear her name.

12. On or about March 5, 2018, Mr. Scearce sent a Freedom of Information Act ("FOIA") request to Ms. Flanagan – the first of many similar FOIA requests initiated by Mr. Scearce in 2018 – seeking DSS Visa card expenditure receipts for the previous year. Such information is provided to DSS Board members during each regular monthly board meeting, and was available to Mr. Scearce without FOIA assistance.

13. Shortly thereafter, Mr. Scearce spoke with local media outlets *Go Dan River*, the *Chatham Star-Tribune*, and WSET, falsely and maliciously describing Ms. Flanagan as creating a hostile work environment at DSS, deriding her leadership ability, and attacking her personal and professional character.   No basis existed for such allegations.

14. At no time did Mr. Scearce provide Ms. Flanagan with even a cursory opportunity to respond to, or defend herself from, these false assertions against her.

15. Throughout the spring and summer of 2018, despite the fact that no formal grievances had been filed concerning Ms. Flanagan, the DSS Board called special

meetings and held interviews with various current and former DSS employees to discuss and investigate DSS and Ms. Flanagan.

16. Upon information and belief, these meetings and interviews were initiated at the behest of Mr. Scearce.

17. Again, Ms. Flanagan was not provided with an adequate opportunity to respond, despite her many requests to provide clarification and information, and ultimately clear her name.

18. Additionally, in or about April of 2018, Mr. Hurt, a retired individual who likened himself to a local reporter, Mr. Ingram, a self-described independent investigator, and others, acting in furtherance of the mutually agreed upon plan of Mr. Hurt, Mr. Scearce, and Mr. Ingram, began attacking Ms. Flanagan's personal and professional reputation on social media and through the local news media.

19. These attacks include numerous malicious social media posts that publicly disseminated false and slanderous information about Ms. Flanagan, including references to Ms. Flanagan as an "abuser", a "liar", a "witch", "corrupt", and a "donkey".

20. Specifically, Mr. Hurt wrote and published multiple defamatory articles and social media posts concerning Ms. Flanagan and her work at DSS, and harassed Ms. Flanagan via email.

21. Mr. Ingram, similarly, attacked and degraded Ms. Flanagan's personal and professional reputation in social media posts and through a weekly Facebook post titled "Sherry's Shenanigans," stalked Ms. Flanagan, and publicly posted her sensitive personal information on Facebook.

22. Then, on or about April 5, 2018, Mr. Scearce initiated a public meeting in which individuals openly and falsely attacked Ms. Flanagan's personal and professional

character and reputation.

23. At the April 5, 2018 meeting, approximately thirty (30) Local DSS employees spoke favorably of Ms. Flanagan's leadership and the agency, while seven (7) individuals - - six (6) employees and Mr. Ingram - - spoke unfavorably of Ms. Flanagan.

24. During this timeframe, the Commonwealth of Virginia investigated the allegations of a hostile work environment and completed a thorough compliance assessment of DSS. Ms. Flanagan asked the Commonwealth of Virginia to conduct a third-party investigation after Mr. Scearce brought his "hostile work environment" claims to Ms. Flanagan's attention but refused to provide her the resources to investigate said claims.

25. On or about June 25, 2018, the Commonwealth released the findings of its investigation.

26. The investigation found that each allegation of a hostile work environment at DSS was unfounded and noted that DSS maintains "a positive work environment" and "performs well and meets or exceeds performance targets for most public assistance programs."

27. In addition, Ms. Flanagan and DSS were found to be in compliance with state laws and regulations.

28. Despite the findings by the Commonwealth, Mr. Scearce, Ms. Evans, Mr. Hurt, and Mr. Ingram continued to speak to the press, the County BOS, and others in the community to intentionally degrade Ms. Flanagan's personal and professional character.

29. As an example, on or about July 5, 2018, Mr. Scearce, Mr. Warren, Mr. Smitherman, and clerk Kim Van Der Hyde emailed CPA Scott Wickham concerning an audit on the Local DSS' Visa card. Mr. Scearce, Mr. Warren, and Mr. Smitherman, upon information and belief, instituted the audit of the Local DSS' Visa card in an attempt to

factually discredit Ms. Flanagan and build a case for the County BOS to take control of the Local DSS.

30. On July 10, 2018, Mr. Wickham via email stated that, but for a few minor receipts missing and his personal opposition to how the Local DSS and other DSS boards fund toy purchases for children at Christmas, he did not find any purchasing irregularities that Mr. Scearce accused the Local DSS of making. The Local DSS funded its toy purchases with donated money, but Mr. Wickham's personal opinion was that the donated money was too much petty cash. Again, Mr. Wickham stated that many DSS Boards across the state maintained too much petty cash, not just the Local DSS.

31. Ms. Flanagan was given Local DSS Board approval to spend the donated funds, as described in paragraph 30. Mr. Scearce had an opportunity to vote against how the funds were maintained and spent but did not.

32. In July of 2018, two of the Local DSS board members' terms expired and were replaced. Mr. Scearce attempted to replace the Local DSS board members with individuals who would vote with Mr. Scearce and align with his interests, including attacking Ms. Flanagan.

33. On or about July 12, 2018, Mr. Scearce attempted to contact newly appointed Local DSS board member Ron Merricks. Mr. Scearce asked Pittsylvania County Supervisor Joe Davis, who nominated Mr. Merricks at Mr. Scearce's request, for Mr. Merricks' contact information. Mr. Scearce wanted to "make sure [Mr. Merricks] has a complete history of all that has been going on with DSS and the opportunity we have on Monday clean the mess up [sic]."

34. Mr. Merricks did not vote to dissolve the Local DSS Board as Mr. Scearce intended, and Mr. Merricks was removed from the Local DSS Board less than a month later,

ostensibly because Mr. Merricks was also on the Pittsylvania County Board of Zoning Appeals (BZA). However, the County BOS knew that Mr. Merricks was on the BZA when he was appointed to the Local DSS Board. Mr. Merricks was replaced by Nancy Eanes, an individual who was aligned with Mr. Scearce.

35. As another example, on July 17, 2018, during a BOS meeting, Mr. Scearce, in an effort to garner support for Local DSS Board dissolution, encouraged the County BOS members to "follow the social media accounts of Vic Ingram and Henry Hurt" that consistently attacked Ms. Flanagan's character, and also referred to Local DSS – and by association, Ms. Flanagan – as "corrupt" and a "mess." These terms were used within the context of describing Ms. Flanagan's performance in her position as DSS Director and were false.

36. Also, on July 17, 2018, Mr. Scearce referred to DSS as an "appalling work environment" in a social media post.  It was clear from the context of the posting that Mr. Scearce blamed Ms. Flanagan for the alleged "appalling" condition at DSS.

37.  On, July 17, 2018, speaking as a County Supervisor, Mr. Scearce stated that there was a "corrupt situation" at the Local DSS, referring to Ms. Flanagan.  Mr. Scearce directed County BOS attorney J. Vaden Hunt to ask the Virginia State Police to investigate "corruption" within the Local DSS. Mr. Scearce made this statement knowing that there were no financial irregularities, vis-à-vis the Visa card and a semiannual audit conducted by Pittsylvania County, and no structural irregularities, due to the June 25 state audit findings, and therefore, was a knowingly false accusation.  At no time has any evidence of corruption on the part of Ms. Flanagan been identified.

38. Additionally, on July 26, 2018, the County BOS held a closed session, seconded by Mr. Scearce. Upon information and belief, during this closed session, Mr. Scearce made

numerous defamatory remarks about Ms. Flanagan.

39. As a result of the July 26, 2018 County BOS closed session, on July 27, 2018, County BOS Chairman Bob Warren sent a letter to DSS Board Chairman Rev. Stedman Payne identifying "issues of concern with DSS." The letter falsely implied and/or accused Local DSS, and by extension, Ms. Flanagan, of malfeasance.

40. On or about July 31, 2018, Mr. Scearce, Ms. Evans, and Ms. Johnson discussed through email how to implement a plan to bring the Local DSS Board under County BOS control and place Ms. Flanagan on paid leave until they could collect sufficient support for her termination from employment.

41. Ms. Flanagan, again, was not provided with an appropriate opportunity to respond to, or defend herself from, Mr. Scearce's false and defamatory statements which, upon information and belief, were made in a continued effort to discredit the Local DSS Board and force the Local DSS under County administration.

42. Indeed, Ms. Flanagan, on several occasions, offered to specifically address any County BOS concerns, and appeared at each County BOS meeting between February of 2018 and August of 2018 to be available for questioning. However, she never received the invitation to speak, even when the matter was placed on the County BOS meeting agenda.

43. Additionally, upon information and belief, Mr. Hurt – encouraged by Mr. Scearce – hired Mr. Ingram, who had a prior unrelated and negative personal history with Ms. Flanagan, to create a biased report full of false and misleading statements that, among other things, accused Ms. Flanagan of running a "cancerous operation."  This report's purpose was to provide support to falsehoods regarding Ms. Flanagan and to create a pretextual reason for retaliation against Ms. Flanagan.

44. Mr. Ingram's report was sent to the County Administrator and County BOS in

August of 2018.  County Administrator Mr. Smitherman also sent the report to the state police. That report has been appended to this Amended Complaint and made a part hereof as **EXHIBIT A**.

45. Within the report, Mr. Ingram, in concert with Mr. Hurt and/or Mr. Scearce, provided numerous defamatory comments, all concerning Ms. Flanagan's employment with the County.  Defendants Hurt and/or Scearce had reviewed or had been briefed on the contents of the report prior to publication.  Defendants Hurt and Scearce agreed to the publication of the report.  All the following comments were published in the report. The factual assertions in the following comments are all false and all concern Ms. Flanagan's job performance:

> a. "I witnessed Sherry Flanagan harass, demote and eventually run off Cindy from a job she dearly loved."
>
> b. "Sherry was openly accusing Cindy and myself [sic] of having an affair."
>
> c. " . . . Flanagan has promoted individuals based on favoritism and not qualifications, experience and education."
>
> d. " . . . workers were instructed to falsify their timesheets as though they had worked their full 40 hour week."
>
> e. "Another policy that Flanagan initiated was that of insubordination.  She notified all employees that insubordination may constitute a basis for dismissal to promote the efficiency of the agency.  The true definition of this was that if you questioned her authority or asked too many questions an employee would be guilty of this and could be terminated.  This was commons knowledge throughout the agency. This policy was not approved by the board."

f. "[At DSS] there were widespread instances of favoritism.  Flanagan's favorites could come in late and leave when they [sic] wanted while others could not.

g. "Regarding subject #3 [DSS employee] Flanagan knew that she had a drug problem but since she was one of Flanagan's friends, she covered for her and would tip her off about being drug tested."

h. "Subject #3 would come to work high, she came in late, drove an agency vehicle while high and promoted to senior worker all because she was a friend of Flanagan's and was her drinking buddy."

i. "On one occasion Flanagan and #3 went off for training and were stopped [sic] in an agency car by the police.  They were not charged with anything and both bragged about being stopped and not being ticketed although they had been drinking."

j. "Regarding the filing of a grievance [sic], it was common knowledge that if you filed one, [sic] you would be fired by Flanagan."

k. ". . . #3 [DSS employee] was reported to be having sex with a male in an agency car and actually left her underwear in the vehicle.  Flanagan knew about this but, yet, [sic] did nothing."

l. "If Flanagan did not like a foster child, [sic] she would speak badly of them. One child in particular was told by Flanagan that she would never graduate from high school or become anything."

m. "Flanagan has walked out of meetings if she didn't get her way [sic] or if there [sic] was something said that she [sic] didn't like."

n. "When Flanagan became director, she picked select workers throughout the

agency to keep her informed of all the happenings.  The other workers knew this, [sic] and it created chaos throughout the agency."

o.  "Flanagan did promote the lie that this writer and Cindy Everett were having an affair.  She also started a similar rumor involving Cheryl Black and Investigator Keith Isom."

p.  "Flanagan told all of her workers that they couldn't file a grievance or take any issues to the board.  And if they did, [sic] they would be fired."

q.  "Flanagan had also been acting in an unprofessional manner while away at training and other meetings.  She had exhibited such unprofessional alcohol-induced [sic] behavior that this person was asked to talk to her about her behavior."

r.  "Her actions were described as unconscionable and not in the best interest of social services."

s.  "Flanagan . . . was billing unreasonably high unapproved rates."

t.  "Flanagan did not like School Superintendent James McDaniel either and would often speak harsh of him.  Flanagan was known to make up stuff just to make matters look worse all the while trying to make herself look good."

u.  "There is a toxic work environment [at DSS] contrary to what the state monkey survey reported."

v.  "There is a network of spies and tattle tails to keep the director updated on events and activities.  Thus, [sic] creating an environment of paranoia and distrust."

w.  "The director has abused her position, the workers and benefits of the office."

x. "The director has diminished the reputation of our agency to that of a party house."

y. "The Play for Pay scams, [sic] whether Christmas events, Halloween, birthday celebrations, [sic] or employee appreciation are unethical, unapproved, [sic] and border being criminal violations."

z. "The director has fostered an environment of deception and revenge."

aa. "The lack of investigation which led to the death of a [sic] three-month-old baby is inexcusable."

bb. "Unprofessional and childish behavior of the director while at meetings and training."

cc. "This investigation was conducted to bring attention to a cancerous operation that has been festering for over ten years."

46. On August 15, 2018, Ms. Flanagan attended the Virginia State Board of Social Services ("VSBSS") meeting in Richmond, Virginia. Ms. Flanagan took her personal annual leave so that she could attend the meeting to voice her concerns as a private citizen.  Ms. Flanagan had no duty under her job to speak at the VSBSS meeting.  Ms. Flanagan did so as an exercise of her First Amendment rights.

47. Ms. Flanagan specifically stated the following:

a. "I am here today to share with you all our experience related to a divide in our locality. As you all know, the Virginia Department of Social Services completed an assessment on our agency as requested by our local Board of Social Services agreed upon by our local Board of Supervisors due to an accusation of a toxic work environment. This accusation [of a toxic work environment] was brought and supported by our dual board of social

services member and Board of supervisor member, Ron Scearce. The assessment highlighted our strengths as well as areas for improvement; however, the agency was not found to harbor a toxic work environment. Using the assessment as a guide, our Leadership Team is working diligently on strengthening our agency."

b. "As employees of Social Services, we anticipate and expect public disagreement with policies, procedures, and difficult decisions we must make in our jobs each day. When the local Board of Supervisors, a part of the collective body, publicly demands State involvement and then denounces the State assessment using the local newspapers as well as social media, it is an assault on the Social Services System as a whole."

48. Ms. Flanagan further spoke about the County BOS' hindering of the Local DSS Board's ability to perform the Local DSS Board's statutory functions.

49. Ms. Flanagan's speech and presence at the meeting incensed and enraged the Defendants.

50. At the VSBSS meeting in which Ms. Flanagan spoke and relayed to VSBSS her grave concerns regarding Mr. Scearce's conduct and its impact on the DSS staff, Deputy Commissioner J.R. Simpson stated that the public smear campaign against Ms. Flanagan and Local DSS amounted to "one of the worst cases of cyber-bullying I've ever seen."

51. Similarly, State DSS Commissioner Duke Storen has stated to local media outlets that Mr. Scearce has been "actively disparaging and working against the local [DSS] department." Commissioner Storen recommended to the VSDSS that VSDSS commence an investigation into Mr. Scearce's actions to undermine the Local DSS and Ms. Flanagan.

The VSDSS voted to investigate Mr. Scearce and his actions to undermine the Local DSS and Ms. Flanagan.

52. Unfortunately, Mr. Scearce, Ms. Evans, Mr. Hurt, and Mr. Ingram's smear campaign against Ms. Flanagan was successful, as their concerted effort to disseminate false and defamatory statements against Ms. Flanagan across multiple third-party media and public platforms ultimately resulted in her unlawful termination from employment on August 30, 2018, two weeks after Ms. Flanagan spoke to the VSDSS on matters of public concern.

53. Ms. Flanagan's termination was the result of a 4-3 vote by the Local DSS Board. Defendants Mr. Scearce, Ms. Eanes, Ms. Evans, and Ms. Johnson voted in favor of Ms. Flanagan's termination.

54. The County is liable for the acts and/or omissions of Mr. Scearce based upon the doctrine of *respondeat superior*. The County is further liable for the acts and/or omissions of Mr. Scearce, as he spoke as an elected member of the County BOS.

55. At the time of her termination and continuously since that time, all of the Defendants have reiterated their earlier defamatory statements against Ms. Flanagan on social media. The Defendants have acted in concert to disseminate false information about Ms. Flanagan at the time of her termination and beyond in an effort to intentionally stigmatize her reputation in the community.

56. The Defendants have posted many numerous false allegations against Ms. Flanagan, all within the context of her work performance. All of the factual assertions within the following posts are false. The text from the most striking defamatory Facebook

posts made, or facilitated by, the Defendants is reproduced as follows[1]:

a. Henry Hurt comment on his Facebook post: "Yes, Cherie and all the nonsensical jibber-jabber from Flanagan and her minions is aimed at distracting this investigation. It is like something out of the Soviet Union that these silly little weasels think they can derail an important investigation. They seek to make it all about Flanagan, and Flanagan is irrelevant compared to some of the children who have suffered (and worse) under DSS mismanagement. My hope is that as the investigation moves forward, they will put Flanagan on ice until it's over. It is ridiculous to think we can have a fair investigation with her standing in the middle of it."

b. Jim Scearce (Mr. Scearce's brother): "This is just the first salvo fired. This opens the door for all the dirt that Mr. Scearce has on Flanagan and Storen to be released to the media. With all the problems coming out of the Richmond DSS headquarters you think they would not want more stirred up. I guess the Governor doesn't care if this makes his office look bad since he appointed Storen. Jack Nimble [a commenter] I see we have another clown on here."

c. Henry Hurt Facebook post: "New DSS Director Hired to Replace Recently Fired Sherry Flanagan." [The rest of the Facebook post talks about new DSS director Christopher Spain. The implication is that Mr. Spain will "clean up the problems" at DSS].

---

[1] Numerous social media posts were made by Jim Scearce, brother of Defendant Scearce. Upon information and belief, these posts were made at the direction of Defendant Scearce and Defendant Scearce is liable for the content due to principles of agency.

d.  Jim Scearce Facebook comment: "Little Ly'n [Lying] Flanagan will never be
    Director of PCDSS [Local DSS] again, never."

    1. Comment by Keith Barbour: "Jim Scearce I'd say what you're doing
       is far more on the side of bullying but you do you, big man."

e.  Ron Scearce Facebook post [personal Facebook page]: "Thankfully, all of
    the bad financial management trends going on in our local DSS that were
    listed in the report submitted to the state [the 'Ingram Report'] will soon be
    eliminated when the county begins handling the financial side of our DSS
    operations. For me, the unauthorized trip to Smith Mountain lake [sic] per
    federal guidelines was the biggest red flag that prompted me to ask for the
    more in-depth audit. The [DSS Visa] credit card statement figures were
    verified for the most part, the actual line charges were not able to be
    confirmed [...]"

f.  Comments on Henry Hurt's Facebook post:

    1. Vic Ingram: "Victor Hudson it was not a promotion [meaning
       Flanagan's job with the VSDSS], however her state friends did find
       her a job."

g.  Comments on Henry Hurt's Facebook post:

    1. Vic Ingram: "Henry we knew that is was just a matter of time before
       she [Arlene Creasy] deleted her continuous retaliatory posts. And
       how I agree with you that Ron Scearce deserves so much credit for
       where we're at today. [...] We now have a wonderful, committed
       director who will do great things for the citizens of our county. With
       his commitment no child or citizen will be ignored or left behind. But

16

you know the Scearce Annex does have a nice ring to it, lol."

    2.     Mr. Ingram's comment was "liked" by Mr. Scearce, which is Facebook speak for agreeing with or supporting a post.

h.  Comments on Henry Hurt's Facebook post:

    1. Ms. Evans: "Are you referring to the states illegal gambling case against Flanagan's DSS?"

    2.     Henry Hurt: "Arlene [one of Flanagan's defenders], I have been told that the new DSS board has agreed to leave your name on the room Sherry Flanagan dedicated to you. So, all is well! You can cheer up now."

i.  Comments on Ronald S. Scearce for Westover District Facebook page:

    1. Mr. Ingram: "This chapter of the [DSS] saga is nothing short of despicable. To "teach you a lesson" because you exposed the shenanigans that occurred on a regular basis is nothing more that [sic] political retaliation. Not only here but across the state are a host of problems that needed attention rather than flexing their muscle on an appointed member elected by the people, our people, not theirs."

    2.     Jim Scearce: "The Duke as in Storen not Wayne is a corrupt as they come. I hope he has fun in Richmond with his playmate Sherrie Flanagan [sic]."

j.  Patricia Evans Facebook post after Ms. Flanagan's termination: "[...] During the General Assembly session our state legislators gave VDSS more power and money while ignoring the dysfunction within the system. There [sic]

problems can only be fixed at the local level if localities have the freedom to make decisions that are best for their community without VDSS interference."

    1. Below the preceding post is Mr. Scearce's Facebook post stating, "I hate to add any negativity now that our once dysfunctional Department of Social Services has been redirected towards excellence under the leadership of our new director [...]"

k. Comment on the preceding Facebook post by Ms. Evans (paragraph 55(j)):

    1. Mr. Hurt: "Ron [Scearce], I'm still shaking my head in disgust over the putrid leadership from Storen and his band of idiotic bureaucrats. I am thrilled that the cancer [Flanagan] has been removed from our DSS and that our BOS finally got on board. I love what the new director is doing on multiple front[s], and I think the public will respond well to his efforts. The worst bureaucrats, are the Richmond bureaucrats, since it is all a high-paying game to them and they care nothing about the local situation. Without your leadership, NOTHING would have changed. Such leadership can be lovely, but just know you have served your fellow citizens magnificently [...]"

    2. Ronald Scearce for Westover District commented (on paragraph 55(k)(1), *supra*): "Thanks Henry! When something like this occurs, you find out who your true friends are."

l. Ronald S. Scearce for Westover District Facebook post: "[...] Mr. Spain is showing that attribute everyday while also insuring [sic] our residents are receiving the service they are entitled to. I want to give a big thanks to Mr.

Spain and his team." [The implication of this post is that Ms. Flanagan was not providing services to Pittsylvania County residents."

> 1. Comments on this post: Jim Scearce: "This just adds fuel to the fire for getting rid of Miss Flanagan. This info should also come in handy at Miss Flanagan's law suit trial [sic] for false termination."

m. Ronald S. Scearce for Westover District: "In every measurable way, our Local DSS has been on the right track since the hiring of Chris Spain in January of 2019 as the new Local DSS director. State benchmarks that were not being met last year are now being met. [...] Vic Ingram and Henry Hurt were two of the few people that actually addressed the multitude of shortfalls in our Local DSS and kept pointing those deficiencies out until a leadership change could be made. I can also add Bob Warren (Chairman of the BoS [sic] last year), to that shortlist of seriously concerned individuals, and I believe the citizens of this county owe them a huge debt of gratitude for having the wherewithal in the face of great diversity [sic], to persevere[....] As for Ms. Mays, who was serving on the Local DSS board when the lowest level of competence was being shown by that organization, her desire for accountability was spectacular in its degree of worthlessness[....]"

n. Comments on Hurt's Facebook page:

> 1. Valerie Tensen: "Flanagan's Shenanigans"
>
> 2. Henry Hurt: "I added this to my post, FYI."
>
> 3. Vic Ingram: "I chose Sherry's Shenanigans as not to bring any disrespect to any of her family members."

o. Henry Hurt Facebook post: "ONE YEAR AGO: FLANAGAN FEARED COUNTY TAKE-OVER OF HER FIEFDOM In yet another solid piece of enterprising reporting, Matt Bell and the Star-Tribune have uncovered evidence of the paranoia widely reported about Social Service Director Sherry Flanagan. More than a year ago, Flanagan balked at providing County Attorney Vaden Hunt with a copy of the DSS by-laws and demanded to know why Mr. Hunt wanted to see the by-laws. It seems preposterous that Flanagan would hesitate on such a routine request[…] It turns out, according to the FOIA'ed emails, that Flanagan was worried that County Administrator David Smitherman was eyeing a take-over of her fiefdom at the [Local] DSS."

> 1. Comments on this post: Alison Flanagan: "If you're reporting 'facts' you should probably be careful to actually tag the correct person in your accusations."

p. Ronald S. Scearce for Westover District Facebook post: "[…] While the financial abuses that went on in our local DSS under the former DSS director's watch were a large part of my desire to investigate our department, the HR abuses were even more impactful, to me[….] Considering they all were part of the 25 current and former employees that reached out to me while I served on our local DSS board, I know full well how bad their treatment was under the former director [Sherry Flanagan], and I hope they can finally find some justice in the end."

q. Henry Hurt Facebook post: "In our case, Director Flanagan served as an officer of the local board. Whatever she wanted, it now appears, she received

with a stamp of approval from the local board. Adding to the problem is the fact that board members have been appointed not in terms of their knowledge or skills but as nice little political pay-backs with stipends around $3000 a year, plus mileage. The good news is that after all of this, the state seems to be scrambling to help local boards provide better management oversight at their facilities. Conceding that administrative boards don't fully understand their responsibilities in running these facilities, the state DSS is promising better training for board members, as well as providing tools to better manage their facilities[....]"

57. Ms. Flanagan incorporates by reference the defamatory statements in Facebook format published by Defendants, which are attached as **EXHIBIT B**.

58. Defendant Ingram, and other defendants, have uttered defamatory statements against Plaintiff orally and in writing. Videos of these defamatory utterances are incorporated by reference herein.

## COUNT I:  DEFAMATION AND DEFAMATION *PER SE*[2]
### (against Defendants Mr. Scearce, Mr. Hurt, and Mr. Ingram)

59. Ms. Flanagan incorporates by reference herein the preceding paragraphs of this Complaint.

60. Ms. Flanagan was defamed when Mr. Scearce, Mr. Hurt, and Mr. Ingram made numerous malicious and false statements concerning Ms. Flanagan's personal and professional character and reputation, and wrongfully imputed to Ms. Flanagan an unfitness to perform the duties of her employment.

---

[2] Under Virginia law, defamation and defamation *per se* are technically distinct causes of action. However, the facts needed to prove defamation *per se* are sufficient to prove defamation. Therefore, these causes of action are combined into a single count for ease of adjudication.

61. These false statements ultimately resulted in Ms. Flanagan's wrongful termination from employment on August 30, 2018 and, consequently, have prejudiced Ms. Flanagan in her profession, thus constituting defamation *per se*.

62. Mr. Scearce, Mr. Hurt, and Mr. Ingram's false insinuations, accusations, and statements concerning Ms. Flanagan purport to be statements of fact, not statements of opinion, and egregiously misstate the truth.

63. Ms. Flanagan incorporates by reference the defamatory statements published by Defendants, including those contained in Exhibit A and within paragraph 55 of the Amended Complaint and appended as Exhibit B.

64. Mr. Scearce, Mr. Hurt, and Mr. Ingram publicly uttered these false and defamatory statements to County employees, members of the BOS, the community, and the press, who heard and understood these false and defamatory accusations to mean that Ms. Flanagan was unfit to perform the duties of her employment, and was legitimately terminated for cause.

65. Although they had a duty not to defame Ms. Flanagan, Mr. Scearce, Mr. Hurt, and Mr. Ingram must have known of the falsity of their statements.  Even if they subjectively believed the statements to be true, they lacked a reasonable basis for such beliefs and/or acted negligently in failing to ascertain the truth.

66. For example, the Commonwealth of Virginia released a report generally finding compliance with all state laws and VSDSS regulations.

67. Further, Mr. Scearce, and others, commissioned financial audit of the Local DSS Visa card uncovered no financial impropriety.

68. Yet, Mr. Scearce, Mr. Hurt, and Mr. Ingram continued to make false statements concerning Ms. Flanagan.

69. As a direct and proximate result of Mr. Scearce, Mr. Hurt, and Mr. Ingram's conduct, Ms. Flanagan has suffered humiliation, embarrassment, mortification, shame, vilification, ridicule, exposure to public infamy, disgrace, scandal, injury to her professional and personal reputations, financial loss, has been hampered in the conduct of her business and affairs, and other damages.

### COUNT II: FIRST AMENDMENT FREEDOM OF EXPRESSION RETALIATION AND WRONGFUL TERMINATION IN VIOLATION OF 42 U.S.C § 1983 (against Defendants Pittsylvania County, Mr. Scearce, Ms. Eanes, Ms. Evans, and Ms. Johnson)

70. Ms. Flanagan incorporates by reference herein the preceding paragraphs of this Complaint.

71. Ms. Flanagan engaged in political speech, to-wit, her August 15, 2018 public comments to VSBSS concerning BOS member Mr. Scearce's defamatory and malicious conduct, and its impact on Ms. Flanagan and her DSS staff.

72. Ms. Flanagan's August 15, 2018 comments to VSBSS touched upon matters of public concern.

73. At all times, Ms. Flanagan acted contemporaneously as a concerned private citizen and DSS employee, and her comments and actions concerning Mr. Scearce were made in order to bring these issues to light.

74. Indeed, Ms. Flanagan took personal leave to speak at the VSBSS meeting in Richmond, so that she would not be seen as speaking as the DSS Director, but rather a concerned private citizen.

75. Ms. Flanagan did not have a personal interest in speaking out. She expressed her opinions as a citizen. The organization and its members to whom she addressed have no control or management over the Board of Supervisors of Pittsylvania County.

76. To underscore the peril of Ms. Flanagan's personal comments for her employment, Ms. Flanagan was speaking about concerns of Mr. Scearce's conduct and its effect on the Local DSS and staff.

77. Ms. Flanagan's interest in participating in political speech regarding matters of public concern outweighed any competing governmental interests, as Ms. Flanagan spoke regarding how those in the social welfare industry needed to be vigilant against political pressure.

78. Ms. Flanagan's August 15, 2018 comments to VSBSS, a method of political speech protected by the First Amendment of the U.S. Constitution, was designed to engage others in her field, not in order to disrupt any function of the County.

79. Defendants Pittsylvania County, Mr. Scearce, Ms. Eanes, Ms. Evans, and Ms. Johnson (hereinafter, "Pittsylvania Defendants") retaliated against Ms. Flanagan by wrongfully denying Ms. Flanagan due process of law, and terminating Ms. Flanagan from employment approximately two weeks subsequent to her involvement in political speech.

80. The Pittsylvania Defendants violated Ms. Flanagan's First Amendment rights such that a cause of action arose under 42 U.S.C. § 1983.

81. As a direct and proximate result of the Pittsylvania Defendants' actions, Ms. Flanagan has suffered and will continue to suffer pecuniary loss, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary loss.

82. The Pittsylvania Defendants were, or should have been, aware that they violated Ms. Flanagan's First Amendment rights when they terminated Ms. Flanagan because of her protected political speech.

83. The Pittsylvania Defendants acted with reckless and/or callous indifference when

they terminated Ms. Flanagan because of this speech.

### COUNT III: DUE PROCESS DEPRIVATION OF LIBERTY INTEREST IN VIOLATION OF 42 U.S.C. § 1983 (against Defendants Pittsylvania County, Mr. Scearce, Ms. Eanes, Ms. Evans, and Ms. Johnson)

84. Ms. Flanagan incorporates by reference herein the preceding paragraphs of this Complaint.

85. Due to the acts and/or omissions of the Pittsylvania Defendants, including, but not limited to, Mr. Scearce's numerous malicious and false statements to members of the public concerning Ms. Flanagan's personal and professional character, work performance, fitness to perform the duties of her employment, and credibility, and the circumstances surrounding Ms. Flanagan's August 30, 2018 termination from employment, Ms. Flanagan's honor, integrity, name, and reputation were damaged.

86. This damage has created a stigma limiting Ms. Flanagan's future employment opportunities, detrimentally affecting her position in the community and her professional field and damaging her personal and professional reputation, such that prospective employers would not consider hiring her.

87. The negative and defamatory comments by the Defendants persisted before her termination, were made contemporaneously with her termination and persisted after her termination, all underscoring a stigma to Ms. Flanagan's reputation in the community and her industry.

88. Ms. Flanagan incorporates by reference the defamatory statements published by Defendants, which are referenced in Exhibit A and paragraph 55 of the Amended Complaint and appended as Exhibit B. The stigmatizing statements from Defendants, whether uttered directly, or upon information and belief, directed to be published, have

continued as recently as November of 2019.

89. Specifically, Mr. Scearce, Ms. Eanes, Ms. Evans, Mr. Warren, and Ms. Johnson's comments concerning "corruption," "hostile work environment," and suggestions of other financial impropriety or malfeasance against Ms. Flanagan falsely stigmatized Ms. Flanagan's reputation for honesty and truthfulness. These individuals/defendants failed to give Ms. Flanagan notice of these accusations or an opportunity to be heard to rebut these false allegations.

90. Besides the isolated defamatory utterances by the Pittsylvania Defendants and Mr. Warren, the cumulative effect of these defamatory utterances by the Pittsylvania Defendants and Mr. Warren significantly and severely stigmatized Ms. Flanagan's professional reputation without the opportunity to respond.

91. The Pittsylvania Defendants and Mr. Warren intentionally failed to provide Ms. Flanagan sufficient opportunity to respond to the numerous false statements and allegations levied against her, or otherwise provide her with an appropriate hearing or procedural process by which she could seek to clear her name.

92. At all times, the Pittsylvania Defendants and Mr. Warren acted to create and disseminate a false and defamatory impression regarding Ms. Flanagan in connection with her position as DSS Director, as well as the circumstances surrounding her termination from employment, such that her liberty interests were deprived.

93. Any proffered justification by the Pittsylvania Defendants for their conduct and/or Ms. Flanagan's termination is pretextual and false.

94. As a direct and proximate result of the Pittsylvania Defendants' actions, Ms. Flanagan has suffered and will continue to suffer pecuniary loss, inconvenience, mental anguish, loss of enjoyment of life, and other non-pecuniary loss.

WHEREFORE Plaintiff Sherry Roberts Flanagan prays for judgment against Defendants Pittsylvania County, Nancy Eanes, Patricia Evans, Andrea Johnson, Ronald Scearce, Henry Hurt, and Victor Ingram, jointly and severally, consistent with these allegations, and requests that the Court award her general damages in the amount of Two Million Dollars ($2,000,000.00) and compensatory and punitive damages in the amount of Two Million Dollars ($2,000,000.00), together with pre-judgment interest from the date of the statements, as well as incidental and consequential costs associated herewith, including attorney's fees and such other relief as a competent Court would deem appropriate.

**JURY TRIAL RESPECTFULLY REQUESTED**

Respectfully submitted,

SHERRY ROBERTS FLANAGAN

By: _____/s/ Thomas E. Strelka_____
Thomas E. Strelka, Esq. (VSB No. 75488)
L. Leigh R. Strelka, Esq. (VSB No. 73355)
N. Winston West IV, Esq. (VSB No. 92598)
STRELKA LAW OFFICE, PC
Warehouse Row
119 Norfolk Avenue, S.W., Suite 330
Roanoke, VA 24011
(540) 283-0802
thomas@strelkalaw.com
leigh@strelkalaw.com
winston@strelkalaw.com

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of December, 2019, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to:

Jim H. Guynn, Jr., Esq.
Jeremy E. Carroll, Esq.
GUYNN, WADDELL, CARROLL & LOCKABY, P.C.
415 S. College Avenue
Salem, Virginia 24153
Phone: 540-387-2320
Fax: 540-389-2350
jimg@guynnwaddell.com
jeremyc@guynnwaddell.com
*Counsel for Defendants Pittsylvania County and
Ronald Scearce*

Glenn W. Pulley, Esq.
Gentry Locke
P.O. Box 6218
Lynchburg, VA 24505-6218
pulley@gentrylocke.com
*Counsel for Defendant Henry Hurt*

and I further certify that I have mailed by United States Postal Service the document to the following:

William "Vic" Ingram
1301 Deercrest Lane
Danville, VA 24541
*Defendant pro se*

/s/ Thomas E. Strelka