IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| SHERRY ROBERTS FLANAGAN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Civil Action No. 7:19CV00413 |
| v. | ) | |
| | ) | **MEMORANDUM OPINION** |
| PITTSYLVANIA COUNTY, VIRGINIA, | ) | |
| et al., | ) | By: Hon. Glen E. Conrad |
| | ) | Senior United States District Judge |
| Defendants. | ) | |

Sherry Roberts Flanagan originally filed a complaint in Roanoke City Circuit Court seeking monetary damages for claims of state law defamation (Count I); wrongful termination in retaliation for First Amendment expression, in violation of 42 U.S.C. § 1983 (Count II); and an alleged due process violation under § 1983 (Count III). Defendants include Pittsylvania County, Virginia (the "County"); Nancy Eanes, Patricia Evans, and Andrea Johnson, in their official capacities as members of the Local Department of Social Services ("DSS") Board; Ronald Scearce, in his individual capacity and in his official capacity as a member of the Local DSS Board and County Board of Supervisors; Henry Hurt; and Victor Ingram. Scearce, the County, Hurt, and Ingram removed the case to this court[1] and filed motions to dismiss.

On October 18, 2019, the parties appeared before the court on the defendants' motions to dismiss. At that hearing, the court informed Flanagan that her allegations were insufficient, but granted her leave to file an amended complaint. Flanagan has since amended her claims, and the defendants have filed follow-on motions to dismiss. On March 16, 2020, the parties again appeared before the court for a hearing on defendants' renewed motions. Thereafter, the court

---

[1]   It remains uncontested that Eanes, Evans, and Johnson have not been served. ECF No. 1 at 2. The court will therefore dismiss the claims against them without prejudice. Fed. R. Civ. P. 4(m).

entered an order that permitted the parties to submit certain supplemental briefing. These motions are now ripe for review. For the reasons stated, the court will grant the motions in part and deny them in part.

## Background

The following allegations are taken from Flanagan's amended complaint. Flanagan couches her claims amid a hazy plot to restructure a local social services board and to oust her from office. The motive behind that alleged campaign was to "advance a political agenda and weaken DSS autonomy and authority." Am Compl. ¶ 5.

In 2006, Flanagan was hired as a DSS Supervisor. In 2009, Flanagan was promoted to DSS Director, and she held that position until her termination in August 2018. The County governs itself through an elected seven-member Board of Supervisors, of which Scearce is a member. Id. ¶¶ 1–5. Scearce is also a member of the Local DSS Board.

According to Flanagan, "[t]he plan to defame and terminate" her "commenced . . . in January 2018, when a DSS employee, "and others," complained about a "hostile work environment created by [] Flanagan." Id. ¶ 6. In February 2018, Scearce began referring to DSS as "persecut[ing]" its employees, stating that Flanagan was "going after people still working at DSS that she believes are a threat," and referred to her as a "bully." Id. ¶ 8. Scearce also spoke with local media, and described Flanagan as creating a hostile work environment, "deriding her leadership ability, and attacking her personal and professional character." Id. ¶¶ 13, 56.

Hurt is a local reporter and Ingram is an independent investigator. In April 2018, both "began attacking [] Flanagan's personal and professional reputation on social media and through the local news media." Id. ¶ 18. Hurt and Ingram allegedly did so in furtherance of a mutual plan with Scearce. Id. This alleged campaign included references to Flanagan as an "abuser," a "liar,"

a "witch," and a "donkey" on social media, but Flanagan does not identify which of the defendants said what.  Id. ¶ 19.[2]  Ingram also created a weekly Facebook post called "Sherry's Shenanigans." Id. ¶ 19.  Flanagan provides a scattershot array of purportedly defamatory statements, which includes statements by non-parties.  Id. ¶ 56; Am. Compl. Ex. B.

During the spring and summer of 2018, the Local DSS Board "called special meetings and held interviews" with certain current and former DSS employees to "discuss and investigate DSS and [] Flanagan."  Am. Compl. ¶ 15.  Flanagan alleges that she did not have an adequate opportunity to respond to this investigation.  Other individuals, including six DSS employees, aired grievances about Flanagan in a public meeting as well; others spoke favorably of Flanagan.  Id. ¶¶ 22–23.  During this time, the Commonwealth also investigated the allegations of a hostile work environment at DSS.  On June 25, 2018, the Commonwealth released its findings and conclusions that there was no hostile work environment, and that Flanagan and DSS were "generally" in compliance with state laws and regulations.  Id. ¶¶ 24–27, 66.

Even after this report, efforts against Flanagan continued.  On July 5, 2018, Scearce requested that an accountant audit a credit card used by Flanagan's department.  Id. ¶ 29.  The accountant responded that certain receipts were missing, and that "too much petty cash" was on hand, but that there were no "purchasing irregularities."  Id. ¶ 30; Am. Compl. Ex. B at 5 (auditor "noted repeated issues with poor documentation on credit card statements and one instance of questionable use of public funds").  On July 17, 2018, Scearce encouraged other members of the Board of Supervisors to follow Ingram's and Hurt's social media accounts, and referred to DSS as a "corrupt situation" and a "mess," and asked the Virginia State Police to investigate "corruption,"

---

[2]      Regarding the word "liar," Ingram's report recounts a third-hand statement by a school board member who called Flanagan a liar.  The word "abuser" appears in the context of Ingram discussing DSS's allegedly "ineffective investigation" into an assault on one of Ingram's family members by his father, and does not refer to Flanagan as an abuser.  Am. Compl. Ex. A at 2–3; Ex. B at 74–75.

despite the accountant's findings.  Id. ¶¶ 35–37; Ex. B at 89–90 (Scearce Facebook post stating that a new DSS director and a new law firm to represent the County "will go a long way to eliminating the corruption at out [sic] local level.  Seems like someone at the top will have to deal with ALL of the corruption at the state level."); id. at 115 (Scearce stated, regarding the Local DSS Board, that "I think I have an innate ability to recognize a corrupt situation when I see one.").  That same day, Scearce referred to DSS as an "appalling work environment."  Id. ¶ 36.

On July 26, 2018, the County Board of Supervisors held a closed session.  Flanagan alleges on information and belief that Scearce made defamatory remarks there, but does not allege what they might have been.  Id. ¶ 38.  Flanagan also alleges that she was not given an opportunity to respond in this meeting.

According to Flanagan, Hurt hired Ingram to create a "biased report" that accused Flanagan of running a "cancerous operation."  Id. ¶ 43.  Flanagan attaches Ingram's report to her amended complaint as Exhibit A.  Ingram's report described his experience as a law enforcement investigator, and in conducting investigations of child abuse in particular.  Am. Compl. Ex. A.  Ingram purported to have interviewed about 20 "informants" and "subjects," including numerous "ex or current" DSS employees between March and August 2018, and included their supposed statements.  Among other things, the report recounted allegations that DSS employees were instructed to falsify timesheets, that drug abuse (and the coverup thereof) took place in DSS, that Flanagan billed at "unreasonably high unapproved rates," and that there were "Pay for Play Scams."  Am. Compl. ¶ 45.  Ingram's report was sent to the County Administrator and County Board of Supervisors in August 2018.  Id. ¶ 44.  Hurt and Scearce also became informed of the report's contents before publication.

On August 15, 2018, Flanagan spoke to the Virginia Department of Social Services.  Id. ¶ 46–47.  Flanagan described the results of the state audit and investigation, including the finding that leadership was working on "strengthening" the local DSS.  Id.  She also stated that complaints about those findings were "an assault on the Social Services System as a whole," and that her department's statutory duties were being hindered.  Id. ¶¶ 47–48.  Flanagan alleges that her speech "enraged" the defendants.  Id. ¶ 49.  A State Department of Social Services Deputy Commissioner called the actions against Flanagan "one of the worst cases of cyber-bullying I've ever seen."  Id. ¶ 50.

The Local DSS Board voted 4-3 to terminate Flanagan on August 30, 2018, with Scearce, Eanes, Evans, and Johnson voting in favor of the termination.  Id. ¶ 53.  Flanagan alleges that the County is liable for the acts and/or omissions of Scearce.  Id. ¶ 54.  Eanes, Evans, and Johnson appear to have no other involvement in this case.

## Standard of Review

To survive a motion under Federal Rule of Civil Procedure 12(b)(6), the "[f]actual allegations [in the complaint] must be enough to raise a right to relief above the speculative level." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007).  A "formulaic recitation of the elements of a cause of action will not do."  Id.  Relief, in other words, must be "plausible."  Id. at 556. "[C]onclusory allegation[s]" are "entirely insufficient."  Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 378 (4th Cir. 2012) ("NASCAR") (citing Ashcroft v. Iqbal, 556 U.S. 662 (2009)).  However, a Rule 12(b)(6) motion "tests the sufficiency of the complaint, not its veracity," and the court must "draw all reasonable inferences in favor of the plaintiff."  Ray v. Roane, 948 F.3d 222, 226, 230 (4th Cir. 2020) (internal quotation marks omitted).

**Discussion**

## I.     Claims Arising Under 42 U.S.C. § 1983

Flanagan brings claims under 42 U.S.C. § 1983—alleging retaliation for speech protected under the First Amendment of the United States Constitution and deprivation of due process—against the County; Scearce in his official capacities as a member of the Local DSS Board and a member of the County Board of Supervisors; and Eanes, Evans, and Johnson in their official capacities as members of the Local DSS Board. Am. Comp. at 1, 22–27. To state a cause of action under § 1983, a plaintiff must allege that she has been deprived of a right guaranteed by the Constitution or laws of the United States and that this deprivation resulted from conduct committed by a person acting under color of state law. West v. Atkins, 487 U.S. 42, 48 (1988). If there is no violation of a federal right, there is no basis for a claim under § 1983. Clark v. Link, 855 F.2d 156, 161 (4th Cir. 1988).

### a.     Claims Against the County

Scearce and the County move to dismiss Flanagan's § 1983 claims in part on the basis that the County is not a proper defendant in this case. A county may be found liable under 42 U.S.C. § 1983 only "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). A municipality cannot be held liable under § 1983 solely because it employed a tortfeasor. Id. at 691. "[M]unicipal liability may," however, "be imposed for a single decision by municipal policymakers under appropriate circumstances." Pembaur v. City of Cincinnati, 475 U.S. 469, 480 (1986). To hold a municipality liable, the decisionmaker must possess "'final authority to establish municipal policy with respect to the action ordered.'" Love-Lane v. Martin, 355 F.3d 766, 782 (4th Cir. 2004) (quoting Pembaur, 475 U.S. at 481).

Resolution of the County's motion requires a recounting of the complex bureaucracy that applies to Virginia social services.  Virginia law entrusts the supervision of local social services departments to the Commissioner of Social Services (the "Commissioner") and the State Board of Social Services (the "State Board").  Wolf v. Fauquier Cty. Bd. of Supervisors, 555 F.3d 311, 321 (4th Cir. 2009); Bockes v. Fields, 999 F.2d 788, 789 (4th Cir. 1993).  By statute, Virginia's Governor appoints both the Commissioner and the members of the State Board.  Va. Code Ann. §§ 63.2-200, 63.2-215.  In addition, the Commissioner manages the Department of Social Services for all of Virginia.  Id. § 63.2-203.

At the same time, Virginia's counties have local departments of social services.  These local departments help to "implement the programs enacted by the Commonwealth."  Bockes, 999 F.2d at 789.  In turn, these local departments are overseen by local boards of social services, whose members are appointed by their respective county from a list of candidates provided by the Commissioner.  Wolf, 555 F.3d at 321-22.  Each local board also selects a local director, who manages day-to-day social services.  Bockes, 999 F.2d at 789.  Beyond the power to appoint local directors, "municipalities have no control over the operations of local social services boards or departments."  Wolf, 555 F.3d at 322.  At the end of the day, local boards report to the Commissioner and State Board, not to counties.  Id.

The Commissioner and State Board also retain final authority over personnel decisions at both the state and local levels.  Bockes, 999 F.2d at 789.  For example, the State Board establishes "minimum education, professional and training requirements and performance standards for the personnel employed by the Commissioner and local boards."  Va. Code Ann. § 63.2-219.  The Commissioner must "remove each employee who does not meet such standards."  Id. § 63.2-208.  While employees "serve at the pleasure of the local board" and local director, the local board must

adhere to guidelines promulgated by the State Board when it hires and fires personnel.  Id. § 63.2-326.  Likewise, the Commissioner oversees the training of all personnel on the local boards and in the local social services departments.  Id. § 63.2-204; Fields v. Prater, 566 F.3d 381, 383–84 (4th Cir. 2009) ("Under state law and regulations adopted by the State Board, all DSS employees are to be hired on the basis of merit . . . .").  Simply stated, local boards report to the Commissioner and State Board, not to counties.  Wolf, 555 F.3d at 322.

In this case, Flanagan was the local director for the County DSS.  Under Virginia law, it is presumed that she was appointed by the Local DSS Board, which serves as the local social services board for the County.  The policies followed by the Department are found in the Virginia Code, the Virginia Department of Social Services Manual, and the Virginia Administrative Code—all of which are drafted by the Commonwealth of Virginia, not the County.  Wolf, 555 F.3d at 322.  Although the Local DSS Board—whose members are appointed by the County—is tasked with selecting directors, like Flanagan, the Local DSS Board ultimately reports to the Commissioner and the State Board, not to the County.  Moreover, the County does not hire, train, or supervise local directors or employees; it has no powers other than selecting the members of the Local DSS Board.  Id.  And even this limited power may only be exercised "[s]ubject to the personnel standards and regulations of the [State Board]."  Va. Code Ann. § 63.2-325.  Finally, Virginia law provides that local directors are actually agents of the Commissioner, not the County.  Id. § 63.2-333.  Thus, Flanagan's claims relate to personnel decisions over which only the State Board and the Commissioner have policy-making authority, again, not the County.  See Wolf, 555 F.3d at 322; Ross v. Cty. of Franklin, Virginia, No. 7:14-CV-0051, 2015 WL 7308678, at *4 (W.D. Va. Nov. 19, 2015).

In the alternative, Flanagan argues that the County can be considered a joint employer with the Commonwealth in this case.  ECF No. 43 (citing Butler v. Drive Auto. Indus. of Am., Inc., 793 F.3d 404 (4th Cir. 2015)).  If two parties "share or co-determine those matters governing the essential terms and conditions of employment," they may be considered joint employers.  Bristol v. Bd. of Cty. Comm'rs, 312 F.3d 1213, 1218 (10th Cir. 2002) (en banc) (quoting Virgo v. Riviera Beach Assocs., Ltd., 30 F.3d 1350, 1360 (11th Cir. 1994)).  Stated otherwise, the court looks at "whether both entities 'exercise significant control over the same employees.'"  Id. (quoting Graves v. Lowery, 117 F.3d 723, 727 (3d Cir. 1997)).

The court has examined this question before, relying on Wolf and Bockes.  In Ross, the court explained that "Virginia law does not give the County any control over the local social services functions, except for appointing members of the Board.  The County does not hire, train, or supervise local social services directors or employees . . . . [O]nly the Commissioner and the State Board have that authority."  Ross, 2015 WL 7308678, at *4.  Flanagan appears to argue that this court was wrong in Ross and that the United States Court of Appeals for the Fourth Circuit was wrong in Wolf.  According to Flanagan, these 2015 and 2009 decisions did not account for statutory amendments made in 2002.  ECF No. 43 at 13 ("Wolf . . . relied heavily on Bockes, which analyzed the question of what entity was the proper employer under Virginia law, as it existed in 1993.  However, the Code of Virginia was amended in 2002, whereby giving a locality greater control over a Local DSS Board.").  This argument is unavailing.  It is enough to state that Wolf is binding on this court, which cannot overrule the Fourth Circuit.

For these reasons, the court will dismiss Flanagan's claims against the County.  On that same basis, the court will dismiss Flanagan's claims against Scearce in his official capacity as a member of the County Board of Supervisors.  See Hughes v. Blankenship, 672 F.2d 403, 406 (4th

Cir. 1982) ("[D]amages may be awarded against a defendant in his official capacity only if they would be recoverable against the governmental entity itself.").  Thus, the court is left to evaluate the claims against Scearce in his individual capacity, and in his official capacity as a member of the Local DSS Board.  See Wolf, 555 F.3d at 322 ("The proper defendant was [] not Fauquier County Board of Supervisors, but rather Fauquier County Social Services Board.").[3]

### b.     Retaliation for Protected First Amendment Speech

The First Amendment protects public employees from being fired in retaliation for speaking on matters of public concern.  See McVey v. Stacy, 157 F.3d 271, 277 (4th Cir. 1998) (citing Pickering v. Board of Educ., 391 U.S. 563, 573 (1968)).  To decide whether a public employee has stated a claim for retaliatory discharge under the First Amendment, courts must determine "(1) whether the public employee was speaking as a citizen upon a matter of public concern or as an employee about a matter of personal interest; (2) whether the employee's interest in speaking upon the matter of public concern outweighed the government's interest in providing effective and efficient services to the public; and (3) whether the employee's speech was a substantial factor in the employee's termination decision."  Id. at 277–78.  "The first two prongs present questions of law to be resolved by the court, and the third prong is a question of fact best resolved on 'summary judgment only in those instances when there are no causal facts in dispute.'"  Lane v. Anderson, 660 F. App'x 185, 191 (4th Cir 2016) (quoting Love-Lane, 355 F.3d at 776).  The second prong, however, is a context-intensive inquiry.  See McVey, 157 F.3d at 278 (listing nine factors to be balanced) (quoting Rankin v. McPherson, 483 U.S. 378, 388–91 (1987)).

---

[3] Thus far, an Eleventh Amendment defense has not been asserted in this case.  See Wolf, 555 F.3d at 322 (declining to consider whether the Fauquier County Social Services Board might assert a successful Eleventh Amendment defense).

As to the first element of the <u>McVey</u> test, the court believes it is plausible that Flanagan's August 15, 2018 speech to the Virginia DSS addressed a matter of public concern.  "[T]he touchstone for deciding if speech involves a matter of public concern is whether its content implicates the public welfare."  <u>Carey v. Throwe</u>, 957 F.3d 468, 475 (4th Cir. 2020).  Courts "consider the character of speech in this regard by taking into account the content, form, and context of a given statement.  By contrast, comments properly characterized as personal grievances about conditions of employment are not matters of public concern."  <u>Lane</u>, 660 F. App'x at 191–92 (discussion of police shooting was a matter of public concern) (internal quotation marks and citations omitted).  But even statements that are "minor in comparison to other cases" may still be "deserving of constitutional protection."  <u>Dunn v. Millirons</u>, 176 F. Supp. 3d 591, 604 (W.D. Va. 2016), <u>aff'd</u>, 675 F. App'x 314 (4th Cir. 2017) (Conrad, J.) (statements regarded alleged animal abuse); <u>Meredith v. Russell County Sch. Bd.</u>, 133 F. Supp. 3d 838, 844 (W.D. Va. 2015), <u>aff'd</u>, 669 F. App'x 122 (4th Cir. 2016) (holding that complaints regarding a county official's misuse of the school bus garage for the purpose of obtaining inspection stickers for his personal vehicles, while "minor," nonetheless addressed a matter of public concern).  As recounted in the amended complaint, Flanagan spoke about the results of a state audit of an important government agency, reforms following that audit, and reactions to the audit by the Local DSS Board.  She spoke at some length about the DSS's functioning.  Am. Compl. ¶¶ 46–49, 61.  Accordingly, the court believes it is plausible that her speech was made as a citizen and concerned a matter of public interest.

Flanagan also offers facts that sufficiently satisfy the second and third elements of this claim.  Again, Flanagan made this speech on her own time:  she alleges that she took personal leave to speak to the Virginia DSS.  She also spoke about aiding, not hindering, DSS's functioning.

Moreover, the amended complaint provides no indication that Flanagan's comments had any detrimental effect on DSS or the Local DSS Board.  At this stage, and viewing the facts in Flanagan's favor, the court can reasonably infer that Flanagan's interest in speaking on a matter of public concern outweighed any countervailing interest of her employer.  The court therefore concludes that the second element of the <u>McVey</u> test is plausibly satisfied.  Further, Flanagan alleges that her speech "enraged" the defendants, and that she was fired approximately two weeks after it.  <u>Id.</u> ¶ 61.  These allegations permit a plausible inference of causation and therefore satisfy the third element.  <u>See</u> <u>Tobey v. Jones</u>, 706 F.3d 379, 390–91 (4th Cir. 2013).

Finally, the court must determine whether Scearce has shown he is entitled to qualified immunity at this stage.  Qualified immunity shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, "'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'"  <u>Wilson v. Layne</u>, 526 U.S. 603, 609 (1999) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  "Government officials are entitled to the defense of qualified immunity unless a § 1983 claim satisfies a two-prong test: (1) the allegations underlying the claim, if true, substantiate the violation of a federal statutory or constitutional right; and (2) this violation was of a clearly established right of which a reasonable person would have known."  <u>Ridpath v. Bd. of Governors Marshall Univ.</u>, 447 F.3d 292, 306 (4th Cir. 2006) (internal quotation marks omitted).  To withstand a motion to dismiss, a § 1983 plaintiff must allege facts that, "if true, show a violation of clearly established constitutional rights."  <u>Goines v. Valley Cmty. Servs. Bd.</u>, 822 F.3d 159, 169 (4th Cir. 2016).

To determine whether a right was clearly established, courts look to cases from the United States Supreme Court, the Fourth Circuit, or the highest court of the state in which the action arose.

Owens ex rel. Owens v. Lott, 372 F.3d 267, 279 (4th Cir. 2004).  In the absence of "directly on-point, binding authority," courts may also consider whether "the right was clearly established based on general constitutional principles or a consensus of persuasive authority."  Booker v. S.C. Dep't of Corr., 855 F.3d 533, 543 (4th Cir. 2017).  And  there need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al–Kidd, 563 U.S. 731, 735 (2011).  Stated otherwise, "a constitutional right is clearly established when 'its contours [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'"  Ridpath, 447 F.3d at 313 (quoting Hope v. Pelzer, 536 U.S. 730, 739 (2002)).

As described above, the court concludes that Flanagan has plausibly stated a claim of retaliation, and thus, that claim survives the first step of the qualified immunity test.  See Ridpath, 447 F.3d at 320.  The court also concludes that Flanagan has articulated a right that was "clearly established" at the time it was allegedly violated.  For many years, "a long line of decisions," from the United States Supreme Court and the Fourth Circuit, has "established that a public employee could not be fired solely for making protected statements."  Id. at 320–21.  Accepting her allegations as true, and drawing reasonable inferences in her favor, that is what Flanagan plausibly alleges was done in this case, and thus her retaliation claim survives the second step of the qualified immunity test at this procedural stage.

Scearce also argues that, as a single member of the Local DSS Board, it is not clearly established that he could violate Flanagan's rights.  "In order for an individual to be liable under § 1983, it must be affirmatively shown that the official charged acted personally in the deprivation of the plaintiff's rights."  See Wright v. Collins, 766 F.2d 841, 850 (4th Cir. 1985) (internal quotation marks and citations omitted).  Thus, officials who have "played key roles" in an alleged

violation, such as by "authoriz[ing]" or "seeking and recommending approval" of the actions at issue may be subject to liability under § 1983.  Williamson v. Stirling, 912 F.3d 154, 171–72 (4th Cir. 2018).  In this case, Flanagan alleges that Scearce led the charge against her and voted for her termination.  The court concludes that these allegations are sufficient to survive the defense of qualified immunity at this stage.  See Roncales v. Cty. of Henrico, No. 3:19-CV-234, 2020 WL 1545883, at *12 (E.D. Va. Mar. 31, 2020) ("Although McDowell, Oughton, Roberts, and Gerald may yet possess a claim of qualified immunity in their individual capacities, the Court cannot conclusively reach that finding at this stage of the litigation.  What the individual Defendants did here may be better explained through discovery.") (citing DiMeglio v. Haines, 45 F.3d 790, 795 (4th Cir. 1995)).  As a result, the court must deny Scearce's motion for qualified immunity at this stage, although he may re-raise the defense at summary judgment.  Behrens v. Pelletier, 516 U.S. 299, 306–07 (1996) (recognizing that a defendant can raise the qualified-immunity defense at both the motion to dismiss and summary judgment stage); see also McVey, 157 F.3d at 278–79 (affirming district court's decision to defer ruling on qualified immunity until "record is better developed" in part because complaint did not "resolve on its face" "whether the agency's interests outweighed [plaintiff's] interest in speaking out publicly").

Accordingly, the court denies the motions to dismiss the retaliation claim against Scearce in his individual capacity and in his official capacity as a member of the Local DSS Board.

### c.    Due Process Deprivation of Liberty Interest

The court next examines Flanagan's Due Process claim.  "To state [a] liberty interest claim under the Due Process Clause, a plaintiff must allege that the charges against [her]: (1) placed a stigma on [her] reputation; (2) were made public by the employer; (3) were made in conjunction with [her] termination or demotion; and (4) were false."  Sciolino v. City of Newport News, 480 F.3d 642, 646 (4th Cir. 2007) (citing Stone v. Univ. of Md. Med. Sys. Corp., 855 F.2d 167, 172

n.5 (4th Cir. 1988)).  Second, the employee "must demonstrate that [her] liberty was deprived without due process of law," namely "notice and opportunity to be heard, with an opportunity "to clear [her] name against [the] unfounded charges."  Cannon v. Vill. of Bald Head Island, N. Carolina, 891 F.3d 489, 501–02 (4th Cir. 2018) (internal quotation marks omitted).  In assessing such claims, the Fourth Circuit has "distinguished statements that imply such serious character defects from statements that simply allege incompetence."  Ridpath v. Bd. of Governors Marshall Univ., 447 F.3d 292, 308 (4th Cir. 2006) (citations omitted).

The court believes that Flanagan has stated a plausible claim that she was deprived of a liberty interest without due process.  As to the first element under Sciolino, Scearce's "corruption" allegations could constitute an actionable stigma on Flanagan's reputation that Flanagan was given no opportunity to clear.  See Sciolino, 480 F.3d at 647 n.2 (allegations that employee had tampered with odometer implied "serious character defects such as dishonesty") (internal quotation marks omitted); Cox v. N. Va. Transp. Comm'n, 551 F.2d 555, 557–58 (4th Cir. 1976) (affirming the trial court's determination that the plaintiff's liberty interest was infringed when her employer publicly linked her discharge to an investigation of financial irregularities, thus "insinuating dishonesty").  Moreover, Scearce made these statements during public hearings, which were transcribed in official records and reported in the press.  Thus, Flanagan has satisfied the second element of her claim at this stage.  See Sciolino, 480 F.3d at 650 ("[A]n employee must allege (and ultimately prove) a likelihood that prospective employers (i.e., employers to whom he will apply) or the public at large will inspect the file.").  Looking to the third element, certain of Scearce's statements were made shortly before he voted to terminate Flanagan, and as part of an alleged months-long crusade to remove Flanagan from office.  Therefore, it is plausible that Scearce's statements were made in conjunction with Flanagan's termination.  See Socol v. Albemarle Cty.

Sch. Bd., 399 F. Supp. 3d 523, 539 (W.D. Va. 2019) (Conrad, J.) (defendant "disclosed the information at issue concurrently with, or in close proximity to" termination). As to the fourth element, the allegations of corruption are plausibly false in light of the accountant's audit, Flanagan's assertions that they are false, and viewing the facts in Flanagan's favor. Flanagan also alleges that she was given no opportunity to clear her name.

Finally, the court is constrained to deny Scearce qualified immunity as to Flanagan's liberty interest claim at this stage. As with her retaliation claim, the court concludes that Flanagan alleges facts making her liberty interest claim plausible. Thus, the claim survives the first prong of the qualified immunity test. See Ridpath, 447 F.3d at 313.

The court is left to determine whether the constitutional right at issue was clearly established at the time it was allegedly violated. The court concludes that it was. At the time of Flanagan's termination in August of 2018, it was clearly established that "'notice and an opportunity to be heard are essential' when a public employee's liberty interest is infringed by a charge implying such serious character defects as 'dishonesty[] or immorality' lodged in the course of an injury such as failure to rehire.'" Id. at 313 (quoting Bd. of Regents of State Colleges v. Roth, 408 U.S. 564, 573 (1972)). "In the wake of Roth and its progeny, [the Fourth Circuit] has reiterated and expounded on the requirements of such a liberty interest claim on numerous occasions." Id. The Fourth Circuit has provided "concrete examples of the types of public statements implying the existence of serious character defects such as dishonesty and immorality." Id. at 314. The examples include a statement linking an employee's discharge to the investigation of financial irregularities. Id. (citing Cox, 551 F.2d at 557–58). "In each of these scenarios, the charge at issue can be understood to insinuate dishonesty and other serious character defects." Id. Here, the court believes that Scearce's alleged charge that Flanagan was "corrupt" is not

16

meaningfully distinguishable from these cases.  As a result, existing precedent gave Scearce "fair warning" that the accusation at issue was "just the type of charge that implicates a protected liberty interest."  Id.; Cox, 551 F.2d at 557–58 (affirming judgment where commission and its officers accused plaintiff of abusing expense account); see also Socol, 399 F. Supp. 3d at 542 (concluding that it was clearly established that "tying [plaintiff's] termination to the deliberate and egregious misuse of purchase cards" implicated plaintiff's liberty interest).

In conclusion, the court denies the motions to dismiss the Due Process claim against Scearce in his individual capacity and in his official capacity as a member of the Local DSS Board.

## II.    **Defamation**

Flanagan brings a defamation claim against Scearce, Hurt, and Ingram.  "In Virginia, the elements of libel are (1) publication of (2) an actionable statement with (3) the requisite intent." Chapin v. Knight–Ridder, Inc., 993 F.2d 1087, 1092 (4th Cir. 1993).  As to this third element, plaintiffs like Flanagan[4] must plausibly allege that a defamatory statement was made with "actual malice": that is, "with knowledge that it was false or with reckless disregard of whether it was false or not."  New York Times Co. v. Sullivan, 376 U.S. 254, 279–80 (1964); Gertz v. Robert Welch, Inc., 418 U.S. 323, 345 (1974).  "Reckless disregard" under this standard requires that the speaker "in fact entertained serious doubts as to the truth of his publication."  St. Amant v. Thompson, 390 U.S. 727, 731 (1968).  In pleading this state of mind, plaintiffs must abide by the well-known standards under Iqbal and Twombly.  See NASCAR, 674 F.3d at 377.  As set forth below, the court concludes that Flanagan has failed to plausibly plead actual malice.[5]

---

[4]    Flanagan concedes that she is a "a limited purpose public" figure, and that the actual malice standard applies in this case.  See ECF No. 36 at 20.

[5]    As a result, the court need not wade through the bog of purportedly "defamatory" statements in the amended complaint to determine which are protected opinion and which are potentially actionable, and most critically, which were actually said by a defendant in this case.  It suffices to say that nearly all of them are non-actionable.  See, e.g., Nigro v. Va. Comm. University/Medical College of Va., 492 F. App'x 347, 356 (4th Cir. 2012) (statements "based

Flanagan's principal, non-conclusory allegations related to actual malice are narrow.  Am. Compl. ¶¶ 65–68.  First, she alleges that Virginia authorities investigated the allegations that Flanagan's department was a hostile work environment, and issued a June 25, 2018 report on them.  Am. Compl. ¶¶ 24–28, 66.  The report concluded that "DSS maintains 'a positive work environment' and 'performs well and meets or exceeds performance targets for most public assistance programs,'" and that the Local DSS "generally" complied with applicable laws.  Id. Further, on Scearce's request, an accountant audited credit card activity at the DSS on July 10, 2018.  The accountant concluded that certain receipts were missing and that there was too much petty cash on hand, but found no other irregularities.  Id. ¶¶ 29–31.  Therefore, according to Flanagan, the defendants' statements about her were made with actual malice.

To begin, the state investigation on the hostile work environment allegations and the accountant's audit do not allow a plausible inference of actual malice regarding statements made before those events took place.  The actual malice inquiry involves examining a defendant's state of mind "at the time of publication."  Tomblin v. WCHS-TV8, 434 F. App'x 205, 211 (4th Cir. 2011).  Thus, "allegations casting doubt on the reliability of . . . sources" that "relate only to events that occurred after publication" are insufficient to show actual malice at the time of publication. Biro v. Condé Nast, 807 F.3d 541, 546 (2d Cir. 2015) (affirming grant of motion to dismiss) (emphasis added).  Because the amended complaint otherwise provides only conclusory allegations related to actual malice before June and July 2018, Flanagan fails to state a defamation claim related to statements made prior to those dates.

---

on . . . perceptions of [a plaintiff's] performance" are "expressions of opinion" and "cannot be proven false"); Morrissey v. WTVR, LLC, No. 3:19-CV-747, 2020 WL 110750, at *4–5 (E.D. Va. Jan. 9, 2020) (holding that "fool," "clown," "nonstop, one ring circus," and "liar" were not actionable); Edwards v. Schwartz, 378 F. Supp. 3d 468, 524–35 (W.D. Va. 2019) (in context, "liar" and similar statements were non-actionable, noting for example that the "statement accusing Edwards of causing 'rifts' employs precisely the sort of loosely definable or variously interpretable term that cannot reasonable be interpreted as a statement of fact") (internal quotation marks omitted).

Flanagan's claims related to statements made thereafter also fail.  For example, the accountant's audit still revealed holes in the DSS's accounting procedures and petty cash policies, and Flanagan fails to provide facts that allow the plausible inference that it was reckless to loosely refer to those practices as "corrupt," even assuming that each usage was defamatory.  See Ollman v. Evans, 750 F.2d 970, 983 (D.C. Cir. 1984) ("Some types of writing or speech by custom or convention signal to readers or listeners that what is being read or heard is likely to be opinion, not fact.  It is one thing to be assailed as a corrupt public official by a soapbox orator and quite another to be labelled corrupt in a research monograph detailing the causes and cures of corruption in public service.") (footnote omitted).

The court also believes Flanagan has not pled actual malice as to the Ingram report.  Ingram's report was allegedly supported by over 20 witness interviews, several of whom corroborated the others' allegations.  The Ingram report also addressed financial issues that were not disposed of by either the Commonwealth of Virginia's investigation into the allegations of a hostile work environment or the accountant's audit into a single credit card.  For example, the Ingram report relied, in part, on information gathered after both of those investigations concluded.  See, e.g., Am. Compl. Ex. A at 26–28 (July 17, 2018 statement including allegations of use of agency vehicle for personal purposes); id. at 32–33 (August 1, 2018 statement alleging the same).  Flanagan does not allege that Ingram invented these sources' statements, and while she labels the report as "biased" and "false," she submits no facts as to why or how it is plausible that Ingram entertained serious doubts about those sources.  Likewise, there is no allegation making it plausible that Hurt and Scearce entertained serious doubts about those same sources after reviewing Ingram's report.  Am. Compl. ¶ 45.

In the same way, Flanagan fails to allege facts plausibly explaining why Scearce was reckless as to the truth of statements of the DSS employees who complained to him about an allegedly hostile work environment in early 2018, or that Scearce invented the fact that former employees spoke to him.  As a result, Flanagan fails to sufficiently allege that the defendants made any specific allegedly defamatory statement with actual malice.  Compare NASCAR 673 F.3d at 378 (affirming dismissal, and holding that reporting on drug test results, even if there were explanations for a positive result, did not plausibly show actual malice); Walker v. Beaumont Indep. Sch. Dist., 938 F.3d 724, 745 (5th Cir. 2019) (affirming dismissal where for example, plaintiff did not allege "the existence or contents of specific discussions, correspondence, or supporting documentation provided to any of the media defendants—either prior to or shortly after the publications in questions—purporting to correct any errors or misstatements in the publications"); Lemelson v. Bloomberg L.P., 903 F.3d 19, 24 (1st Cir. 2018) (affirming dismissal where complaint did not allege that reporter "knowingly relied on a source who had a clear motive to fabricate the story"); with Zimmerman v. Al Jazeera Am., LLC, 246 F. Supp. 3d 257, 283–86 (D.D.C. 2017) (concluding that complaint alleged actual malice where defendants relied on single source who recanted his allegations multiple times prior to publication and defendants had not investigated or corroborated his statements, but finding it a "close question").

Finally, Flanagan attempts to salvage her theory of actual malice on allegations that the defendants harbored personal animus towards her or had political motives.  This is not enough in light of the other deficiencies in her pleadings.  See NASCAR 674 F.3d at 378 ("The Appellants go on to point to their allegations that the Appellees intended to harm Mayfield . . . . But these allegations simply do not suggest that Appellees knew their statements were false or that they were reckless with respect to their veracity.").  Thus, the court will dismiss the defamation claims against

Scearce, Hurt, and Ingram for failure to plausibly plead actual malice.[6]

<u>**Conclusion**</u>

For the reasons stated, the court will grant the individual motions to dismiss filed by Hurt and Ingram, and will grant in part and deny in part the joint motions filed by Scearce and the County: Hurt, Ingram, Eanes, Evans, Johnson, and the County are dismissed as defendants in this case. Likewise, the claims arising under 42 U.S.C. § 1983 against Scearce in his official capacity as a member of the County Board of Supervisors and the defamation claim against Scearce are dismissed. However, the claims arising under 42 U.S.C. § 1983 against Scearce in his official capacity as a member of the Local DSS Board and in his individual capacity survive the instant motions to dismiss.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to all counsel of record.

DATED: This __27th__ day of May, 2020.

_____
Senior United States District Judge

---

[6]    Hurt argues that he is entitled to fees and costs under a Virginia statute that provides immunity to defamation defendants for statements "regarding matters of public concern that would be protected under the First Amendment to the United States Constitution"; and (2) not "made with actual or constructive knowledge that they are false or with reckless disregard for whether they are false." Va. Code Ann. § 8.01-223.2(A). Because the court dismisses the claims against Hurt, the statute provides that Hurt "<u>may</u> be awarded reasonable attorney fees and costs." Va. Code § 8.01- 223.2(B) (emphasis added). The court declines to grant fees and costs, concluding that Hurt has not shown that such relief is appropriate in this case. <u>See</u>, <u>e.g.</u>, <u>ABLV Bank v. Ctr. for Advanced Def. Studies Inc.</u>, No. 1:14-CV-1118, 2015 WL 12517012, at *2 (E.D. Va. Apr. 21, 2015) (noting that the purpose of so-called "Anti-SLAPP" laws like Virginia's is to protect plaintiffs from "the chilling effect" of "meritless civil action[s]," which are "intended to force upon a political opponent the high cost of defending against a lawsuit"). Here, Flanagan's theory of defamation is not so meritless such that awarding fees would serve the purposes of § 8.01-223.2.