UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| SHERRY ROBERTS FLANAGAN, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 7:19-cv-00413 |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| RONALD SCEARCE, | ) | By:  Hon. Thomas T. Cullen |
| | ) | United States District Judge |
| Defendant. | ) | |

After the Pittsylvania County Department of Social Services ("DSS") Board voted to remove her as DSS Director, Plaintiff Sherry Roberts Flanagan sued Defendant Ronald Scearce, a member of the DSS Board and the Pittsylvania County Board of Supervisors.[1] In a nutshell, Flanagan alleges that Scearce violated her federal constitutional rights by orchestrating a public smear campaign about her stewardship of the DSS and terminating her for speaking publicly about this perceived mistreatment.

The matter is currently before the court on Scearce's motion for summary judgment on Flanagan's claim that she was wrongfully terminated in retaliation for First Amendment expression, in violation of 42 U.S.C. § 1983 (Count II), and Flanagan's claim alleging a deprivation of due process in conjunction with her termination, in violation of 42 U.S.C. § 1983, against Scearce in his individual capacity and in his official capacity as a then-member

---

[1] Scearce is no longer a member of the DSS Board. Flanagan also sued Pittsylvania County, three other DSS Board members who had voted in favor of her termination, and two Pittsylvania County residents, Henry Hurt and Victor Ingram, who publicly promoted her ouster. On May 27, 2020, the Honorable Glen E. Conrad, Senior U.S. District Judge, granted these defendants' motion to dismiss, leaving Scearce as the sole remaining defendant. *Flanagan v. Pittsylvania Cnty., Va.*, No. 7:19cv413, 2020 WL 2754754 (W.D. Va. May 27, 2020).

of the DSS Board (Count III).[2] In support of this motion, Scearce contends that Flanagan has failed to present sufficient evidence to support the elements of her First Amendment retaliation and due process claims. Alternatively, Scearce argues that the doctrine of qualified immunity bars Flanagan's due process claim.

Because Flanagan has failed to establish that Scearce made actionable public statements about her at the time of, or in close temporal proximity to, her August 30, 2018 termination, she has not established a key element of her due process claim. But even if Flanagan had satisfied this element, qualified immunity would shield Scearce from personal liability for this due process claim. The court will therefore enter summary judgment on this claim.[3]

The court, however, concludes that Flanagan has satisfied the elements of her First Amendment retaliation claim. Flanagan has presented sufficient evidence that the speech she gave two weeks before her termination was the determinative factor in Scearce's—and the DSS Board's—decision to fire her, such that a reasonable jury could return a verdict in her favor. The court will therefore deny summary judgment on the First Amendment retaliation claim. That claim will be decided by a jury.[4]

---

[2] Senior Judge Conrad dismissed Flanagan's defamation claim against Scearce (and the other defendants). *See id.* Counts II and III are all that remain.

[3] The court will also enter summary judgment on the official capacity claims. Flanagan has failed to establish the necessary elements for these claims, and Scearce, as a former DSS Board member, is not a proper defendant.

[4] And, in so doing, the jury will have a narrow task—deciding only whether Flanagan's speech two weeks before her firing was the but-for cause of the termination decision. *See Lane v. Anderson*, 660 F. App'x 185, 191 (4th Cir. 2016) (quoting *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004) ("The first two prongs [of a First Amendment retaliation claim] present questions of law to be resolved by the court, and the third prong is a question of fact best resolved on 'summary judgment only in those instances when there are no causal facts in dispute.'").

## I.   BACKGROUND

In 2006, Flanagan was hired as a DSS Supervisor for Pittsylvania County Department of Social Services. In 2009, she was promoted to DSS Director, a position she held until the DSS Board voted to terminate her on August 30, 2018.

Pittsylvania County governs itself through an elected seven-member Board of Supervisors, of which Scearce is a member. During the events giving rise to this lawsuit, Scearce also served as a member of the DSS Board, until the Virginia Social Services Board suspended him in December 2018. Scearce then permanently vacated his seat on the DSS Board, but he remains a member of the Board of Supervisors.

### A.  Procedural History

Following her termination, Flanagan commenced this lawsuit against Pittsylvania County, Nancy Eanes, Patricia Evans, Andrea Johnson, Henry Hurt, William "Vic" Ingram, and Scearce. Flanagan's amended complaint included three claims: (1) defamation and defamation *per se* against Scearce, Hurt, and Ingram (Count I); (2) First Amendment freedom of expression retaliation and wrongful termination against the county, Eanes, Evans, Johnson, and Scearce (Count II); and (3) deprivation of Fourteenth Amendment liberty interests without due process of law against the county, Eanes, Evans, Johnson, and Scearce (Count III). (*See* Am. Compl. [ECF No. 26].)

Defendants thereafter filed a motion to dismiss for failure to state a claim. (*See* ECF Nos. 31, 33, 34.) On May 27, 2020, the Honorable Glen E. Conrad, Senior U.S. District Judge, granted the motion to dismiss for all claims with respect to defendants Hurt, Ingram, Eanes,

Evans, Johnson, and the County.[5] *See Flanagan*, 2020 WL 2754754, at *10. Senior Judge Conrad likewise dismissed the defamation claim against Scearce. *Id.* Following these dismissals, just two of Flanagan's claims against Scearce remained: (1) deprivation of liberty interest and (2) First Amendment retaliation.[6]

Scearce then moved for partial summary judgment on the deprivation of liberty interest claim, arguing only that Flanagan failed to establish that she suffered the requisite stigma to her reputation. *See Flanagan v. Pittsylvania Cnty., Va.*, No. 7:19cv413, 2020 WL 4937126, at *1–2 (W.D. Va. August 24, 2020). Senior Judge Conrad denied this motion on August 24, 2020, finding that Flanagan demonstrated sufficient reputational injury because of the difficulty she experienced finding a new job and the $25,000 pay cut she was forced to accept as a result. *Id.* at *2–3. Scearce now moves for summary judgment on the deprivation of liberty interest (on different grounds) and First Amendment retaliation claims.

## B. Organizational Structure of DSS

A basic understanding of the structure of local social services departments in Virginia provides valuable context in this case. Under Virginia law, the Commissioner of Social Services and the State Board of Social Services supervise all local social services departments. *See id.* Local social services departments are also overseen by local boards whose members are

---

[5] The court dismissed the claims against Eanes, Evans, and Johnson without prejudice due to Flanagan's failure to serve these parties. *Flanagan*, 2020 WL 2754754, at *1, n.1.

[6] These claims are brought against Scearce in his individual capacity and in his official capacity as a member of the DSS Board. *See id.* at *10. Senior Judge Conrad dismissed both the First Amendment retaliation claim and the deprivation-of-liberty-interest claim against Scearce in his official capacity as a member of the County Board of Supervisors. *Id.*

appointed by their respective county's governing authority from a list of candidates provided by the Commissioner. *Id.* at *4.

Virginia law establishes two types of social services boards: Administrative and Advisory. (*See* ECF No. 101-1 at 22.) Administrative boards, like the DSS Board in Pittsylvania County, have greater autonomy over their budgets and internal affairs than Advisory boards.[7] Administrative boards have the authority to appoint a director of social services to manage the day-to-day operations in the local department, review the director's performance, and terminate a director when necessary. (*See* ECF 101-1 at 25–27.) But "[b]eyond the power to appoint local directors, 'municipalities have no control over the operations of local social services boards or departments'. . . . Simply stated, local boards report to the Commissioner and State Board, not to counties." *Flanagan*, 2020 WL 2754754, at *4 (quoting *Wolf v. Fauquier Cnty. Bd. of Supervisors*, 555 F.3d 311, 322 (4th Cir. 2009)).

DSS was under the supervision of an Administrative board during Flanagan's tenure as director. According to Flanagan, Scearce "endeavored to convert the [Pittsylvania County Department of Social Services] into an Advisory Board" and, in so doing, increase the control that the Board of Supervisors, of which he was also a member, could exercise over DSS. (Pl.'s Mem. Opp'n Mot. Summ. J. 4 [ECF No. 101].)

### C. Factual Background

In August 2017, Scearce attended a walk-through of DSS in his capacity as a new DSS Board member. During the tour, he introduced himself to the employees and handed out business cards. In early 2018, Scearce apparently started receiving complaints from DSS

---

[7] Unlike Administrative Boards, Advisory Boards answer directly to the governing body of the locality.

workers regarding workplace conditions. Based on these complaints, Scearce began to believe that Flanagan maintained a "hostile work environment." (ECF No. 86-5 at 5.)

On February 20, 2018, the chairman of the Pittsylvania County Board of Supervisors sent a letter to the DSS Board chairman expressing concerns about the workplace conditions at DSS and asking the DSS Board to conduct an independent investigation into the matter. (*Id.*) Members of the DSS Board conducted recorded interviews of DSS employees and later held a public session of the board on April 3, 2018, for members of the public to voice their concerns. (*Id.* at 5–6.) While some employees expressed concerns about the environment at DSS, others spoke positively about their experience with DSS and about Flanagan's management. (*Id.* at 6.) On April 16, 2018, the DSS Board accepted an offer by the Virginia Department of Social Services ("VDSS") Commissioner to conduct an organizational assessment of the DSS. (ECF No. 101-13 at 3.) On June 25, 2018, this investigation concluded that there appeared to be a "positive work environment" at the DSS and that the department was complying with all state laws and regulations. (*See id.* at 1, 39.)

During the period that VDSS conducted its investigation, Ingram was hired to move forward with an independent investigation into the environment at DSS and specifically Flanagan's management of the department.[8] Hurt, Scearce, and Ingram began communicating through e-mail[9] about, in Hurt's words, "the Flanagan mess." (*See* ECF No. 101-5 at 331.)

---

[8] It remains unclear who exactly hired Ingram, a former Pittsylvania County Sheriff's deputy. But Flanagan contends that Scearce encouraged Hurt to hire Ingram to perform this investigation. (Pl.'s Mem. Opp'n Mot. Summ. J. 14 [ECF No. 101].) Ingram released his 37-page report on July 27, 2018. (ECF No. 101-12.)

[9] Flanagan produced over 700 pages of e-mail communications between Hurt, Scearce, Ingram, and later Evans. (*See* ECF No. 101-5.)

These e-mails typically shared proposed news stories written by Hurt, a freelance reporter, that detailed the DSS controversy. Scearce, Hurt, and Ingram also began posting about the "corruption" and mismanagement allegations against Flanagan and the DSS on social media and through news media.[10] Scearce encouraged their social media activity in May 2018 by sending an e-mail to the pair calling their posts "outstanding." (ECF No. 101-5 at 239). He remarked in the same e-mail that he wished the posts "were moving the other board members in the right direction." (*Id.*) Scearce emphasized in a later e-mail to Hurt that he "might want to put the pressure on Sherry [Flanagan] for the time being." (*Id.* at 241.)

Scearce also sought to add certain individuals to the DSS Board. In "June or July of 2018" he nominated his "friend" Evans to sit on the Board. (*See* Dep. of Patricia Evans 10:4–5, 17:4–5, May 21, 2021 [ECF No. 101-11].) According to Flanagan, Evans "was often commenting on Facebook in favor of what Mr. Scearce was doing, as well as commenting negatively against [her]." (*See* Dep. of Sherry Flanagan 171:7–12, May 14, 2021 [ECF No. 101-2].) Scearce also worked to get Ron Merricks to join the DSS Board and attempted to set up a meeting with him in July of 2018 to make sure he understood the "complete history of all that has been going on and the opportunity [the DSS Board would] have on Monday [to] clean the mess up." (ECF No. 101-8 at 6.) In a May 16, 2018 e-mail to Hurt, Scearce remarked: "With my appointment of Patricia Evans to the [Social Services Board], and Ron Merricks getting appointed by Joe Davis, I will have the votes I need to accomplish everything without the [Board of Supervisors] even getting involved." (ECF No. 101-5 at 384–85.) But in a DSS

---

[10] Flanagan produced over 140 pages of Facebook posts and news articles related to this incident. (*See* ECF No. 101-6.)

Board meeting on July 16, 2018, Merricks voted *against* Scearce's motion to investigate Flanagan's management of DSS; he stepped down from the position soon after. Eanes later replaced Merricks on the DSS Board.

On July 17, 2018, Scearce gave a speech recounting the allegations that DSS employees had brought to his attention and the attempts to initiate an independent investigation into the situation at DSS. In this speech, Scearce said:

> If you want to get a clear picture of what those allegations are, I urge you to follow the social media accounts of Vic Ingram and Henry Hurt. Mr. Ingram and Mr. Hurt have detailed almost every allegation that was presented to me by interviewing and corroborating directly with the people that had the courage to come forward.

(ECF No. 101-6 at 115.) On July 26, 2018, the Board of Supervisors voted to initiate an investigation by the Department of Virginia State Police into the "corruption" allegations against Flanagan and the DSS. (*Id.* at 1–2.) Scearce spoke positively about this decision in a Facebook post the next day. (*Id.* at 34–35.) Over the course of these accusations and investigations, Flanagan sought—but was never given—an opportunity for a hearing regarding the allegations before the Board of Supervisors to clear her name.

On August 15, 2018, Flanagan travelled to Richmond, Virginia, to attend a meeting of the VDSS Board. Flanagan took personal leave time from her position as the DSS director to attend the meeting and, while there, gave a speech to the state DSS officials in attendance. In her own words, Flanagan wanted to voice concerns about "the effect that the [social media] posting and that the media had on the agency." (Flanagan Dep. at 131:7–9.) She felt "that there [were] no protection[s] for local directors" and that "[t]he State really has nothing there that can support directors." (*Id.*)

Flanagan declared in her speech that she intended to share with the VDSS an "experience related to a divide in [her] locality." (ECF No. 101-16 at 1.) She explained that the VDSS recently completed an assessment of the Pittsylvania County DSS, at the request of her local DSS Board and the Board of Supervisors, to address concerns of a hostile work environment. (*Id.*) Flanagan specifically mentioned that Scearce "brought and supported" this accusation. (*Id.*) Explaining the impact of this event on the DSS, Flanagan continued:

> As employees of Social Services, we anticipate and expect public disagreement with policies, procedures, and difficult decisions we must make in our jobs each day. When the local Board of Supervisors, a part of the collective body, publically [*sic*] demands State involvement and then denounces the State assessment using the local newspapers as well as social media, it is an assault on the Social Services System as a whole.

(*Id.* at 2.) She concluded her speech with a plea to the VDSS: "We need your help to accomplish this work in Pittsylvania County as well as every other local agency supported by this State Board." (*Id.*)

Hurt referenced Flanagan's speech in an e-mail sent to Scearce (among others) on August 24, 2018. In this e-mail, which appears to contain the text of a news article entitled "Sherry Flanagan: Catch Me If You Can," Hurt writes:

> But this woman for all seasons, Sherry Flanagan, was just getting started. When her threatening lawyer's letter had little effect, her next stop was in Richmond—accompanied by three of her workers (on hand to praise her) and by her lawyer . . . . What came out of that meeting (in which no one represented Ronald Scearce) is a letter from Virginia Social Services Commissioner Duke Storen proposing the removal of Supervisor Scearce from the Pittsylvania Social Services Board.

(ECF No. 101-5 at 677.)

On August 30, 2018, 15 days after Flanagan's speech in Richmond, Scearce and three other members[11] of the DSS Board voted to terminate Flanagan. (Evans Dep. at 16:19–25.) Flanagan was not given an opportunity to speak to the DSS Board at this meeting. (Flanagan Dep. at 173:10–19.) Thereafter, she was unable to find employment with Roanoke, Franklin, Halifax, and Henry counties or with the cities of Roanoke and Danville. On November 25, 2018, Flanagan accepted a job with the VDSS in Richmond, a three-and-a-half-hour drive from her residence in Henry County. In this job Flanagan reportedly earns $25,000 less than she received as the director of DSS, has fewer responsibilities than in her previous role, and had to start over with her sick and annual leave.

Scearce was later the subject of an investigation by the VDSS regarding his conduct as a board member and his criticism of VDSS. In October 2018, while Scearce was still under investigation, Flanagan spoke about the current state of the DSS and her experience with the DSS Board and the Pittsylvania County Board of Supervisors at a VDSS meeting. Scearce shared a link to a news article about Flanagan's speech and wrote this Facebook post:

> Ms. Flanagan paints a pretty sad picture, I must say. I hope someone from the VDSS board will take a little time to talk to me before they make a decision. I suppose 'a little time' might actually take a day or two if they truly want a clear picture of what has been going on in our local department, but it is ultimately up to them. Regardless, kicking me off of our local board will not stop my efforts to clean our department up. Our citizens, especially those that need it most, deserve better!

(ECF No. 101-6 at 48.)

---

[11] The other three votes came from Evans, Johnson, and Eanes.

In early December 2018, the VDSS voted to suspend Scearce from the DSS Board. Scearce again aired his frustrations on Facebook, remarking that he was "truly not surprised by the actions of the VDSS" and writing:

> Thankfully we are making great progress in correcting all of the issues facing our local department by our recent hiring of a new director, and are in negotiations with a new law firm that will actually represent the interests of our local DSS. Those two accomplishments alone will go a long way to eliminating the corruption at out [*sic*] local level.

(ECF No. 101-6 at 89–90.) A December 26, 2018, news article about Flanagan's new position quoted Scearce's response to VDSS's hiring decision: "I'm truly appalled. For them to hire her shows their lack of common sense and lack to [*sic*] manage the state system." (ECF No. 101-6 at 12.) Scearce later permanently vacated his seat on the DSS Board. He continued to occasionally post about the DSS on Facebook through October 2019, referring to the department under Flanagan's leadership as "once dysfunctional" and noting that the department now "has been on the right track since the hiring of Chris Spain in January 2019 as the new [local DSS] director." (ECF No. 101-6 at 100–01, 106–08.)

This case now comes before the court on Scearce's motion for summary judgment with respect to the remaining two claims in the case: (1) deprivation of liberty interest and (2) First Amendment retaliation.

## II.   STANDARD OF REVIEW

Under Rule 56(a), the court must "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Glynn v. EDO Corp.*, 710 F.3d 209, 213 (4th Cir. 2013). When making this determination, the court

should consider "the pleadings, depositions, answers to interrogatories, and admissions on file, together with . . . [any] affidavits" filed by the parties. *Celotex*, 477 U.S. at 322. Whether a fact is material depends on the relevant substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* (citation omitted). The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. If the moving party meets that burden, the nonmoving party must then come forward and establish the specific material facts in dispute to survive summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).

In determining whether a genuine issue of material fact exists, the court views the facts and draws all reasonable inferences in the light most favorable to the nonmoving party. *Glynn*, 710 F.3d at 213 (citing *Bonds v. Leavitt*, 629 F.3d 369, 380 (4th Cir. 2011)). Indeed, "[i]t is an 'axiom that in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor.'" *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 310 (4th Cir. 2014) (internal alteration omitted) (quoting *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) (per curiam)). Moreover, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255. The nonmoving party must, however, "set forth specific facts that go beyond the 'mere existence of a scintilla of evidence.'" *Glynn*, 710 F.3d at 213 (quoting *Anderson*, 477 U.S. at 252). The nonmoving party must show that "there is sufficient evidence favoring the nonmoving party for a jury to return

a verdict for that party." *Anderson*, 477 U.S. at 249. "In other words, to grant summary judgment the [c]ourt must determine that no reasonable jury could find for the nonmoving party on the evidence before it." *Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 124 (4th Cir. 1990) (citing *Anderson*, 477 U.S. at 248). Even when facts are not in dispute, the court cannot grant summary judgment unless there is "no genuine issue as to the inferences to be drawn from" those facts. *World-Wide Rights Ltd. P'ship v. Combe, Inc.*, 955 F.2d 242, 244 (4th Cir. 1992).

## III.   ANALYSIS

Flanagan alleges Scearce violated 42 U.S.C. § 1983 in both his individual capacity and his official capacity as a member of the DSS Board by (1) wrongfully terminating her in retaliation for speech that was protected under the First Amendment (Count II) and (2) depriving her of Fourteenth Amendment liberty interests without due process of law (Count III). The court will address the official capacity claims before analyzing those brought against Scearce in his individual capacity.

### A.   Official Capacity Claims

As a preliminary matter, the court concludes that neither claim brought against Scearce in his official capacity as a member of the DSS Board can survive the motion for summary judgment. Unlike individual-capacity claims, official-capacity claims "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dep't of Social Servs.*, 436 U.S. 658, 690 n.55 (1978). An official-capacity action is therefore "in all respects other than name, to be treated as a suit against the entity" and "is *not* a suit against the official personally, for the real party in interest is the entity." *Kentucky v. Graham*, 573 U.S. 159, 166 (1985). This means that official-capacity claims are only actionable

"when the entity itself is a moving force behind the deprivation" and "the entity's policy or custom . . . played a part in the violation of federal law." *Id.* (internal quotation marks and citations omitted); *see also Davison v. Randall*, 912 F.3d 666, 688 (4th Cir. 2019) (noting that "official capacity suits are treated as suits against the municipality" and that "a municipality is subject to Section 1983 liability only when its policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the plaintiff's injury") (cleaned up).

Flanagan's official-capacity claims fail for two reasons. First, Flanagan has not shown that a "policy or custom" of the DSS Board "played a part" in the alleged violations of the First or Fourteenth Amendments. Flanagan failed to cite any policy or custom that caused or contributed to her termination and attendant constitutional injuries. To the contrary, Flanagan contends that Scearce himself, rather than a policy, played the determinative role in the alleged constitutional violation, and that, in so doing, he essentially acted as a rogue board member, in contravention of normal board practice.

Second, and perhaps more problematic to Flanagan's case, Scearce is no longer a member of the DSS Board. This means any claim brought against him in his official capacity is no longer viable. *Id.* at 166 n.11 ("In an official-capacity action in federal court, death or replacement of the named official will result in automatic substitution of the official's successor in office."). The court will accordingly grant Scearce's motion for summary judgment on all official capacity claims brought against him.

B.     **Individual Capacity Claims**

1.  **First Amendment Retaliation**

Flanagan next claims that Scearce wrongfully terminated her in retaliation for the speech that she gave in Richmond before the VDSS. For a public employee to succeed on a claim for retaliatory discharge under the First Amendment, a court must find that (1) the employee was speaking as a private citizen upon a matter of public concern, rather than as an employee about a matter of personal interest; (2) the employee's interest in speaking upon a matter of public concern outweighs the government's interest in providing effective and efficient services to the public; and (3) the speech was a substantial factor in the employee's termination. *McVey v. Stacy*, 157 F.3d 271, 277–78 (4th Cir. 1998). "The first two prongs present questions of law to be resolved by the court, and the third prong is a question of fact best resolved on 'summary judgment only in those instances when there are no causal facts in dispute.'" *Lane v. Anderson*, 660 F. App'x 185, 191 (4th Cir. 2016) (quoting *Love-Lane v. Martin*, 355 F.3d 766, 776 (4th Cir. 2004)). In his motion for summary judgment, Scearce focuses on the third prong, arguing that Flanagan has failed to adduce sufficient evidence from which a reasonable jury could conclude that her Richmond speech was the "but-for cause" of his—and the Board's—decision to fire her. The court disagrees and will deny Scearce's motion for summary judgment on this claim.

Although not directly challenged by Scearce, the court is satisfied that Flanagan has established the first prong of the First Amendment retaliation test because she spoke as a private citizen in front of the VDSS on a matter of public concern—community divisions affecting the provision of social services in Pittsylvania County. "[T]he touchstone for deciding

if speech involves a matter of public concern is whether its content implicates the public welfare." *Carey v. Throwe*, 957 F.3d 468, 475 (4th Cir. 2020). Speech that concerns "purely personal" topics, such as "'personal grievances, complaints about conditions of employment, or expressions about other matters of personal interest[,] do not constitute speech about matters of public concern' and therefore cannot sustain a First Amendment retaliation claim." *Id.* (quoting *Stroman v. Colleton Cnty. Sch. Dist.*, 981 F.2d 152, 156 (4th Cir. 1992)). To determine if a public employee is speaking on a matter of public concern or on a purely personal topic, the court will "look to the 'content, context, and form of the speech at issue in light of the entire record.'" *Id.* (quoting *Urofsky v. Gilmore*, 216 F.3d 401, 406 (4th Cir. 2000)).

Flanagan took personal time off from work to appear before VDSS as a private citizen for this speech. She did not specifically discuss any personal attacks made on her by Scearce or other aggrieved community members. Instead, Flanagan described in her speech the community's failure to accept the results of the state audit and the impact it had on the provision of social services. She described this as "an assault on the Social Services System as a whole," and concluded by asking the VDSS to help her department continue providing social services in Pittsylvania County "as well as every other local agency supported by [the VDSS]." (ECF No. 101-16 at 1–2.) Considering the content, context, and form of the speech, the court finds that Flanagan has satisfied the first prong by speaking as a private citizen on a matter of public concern.

Similarly, Flanagan has satisfied the second prong of the First Amendment retaliation test because her interest in speaking about this matter of public concern outweighed any government interest in providing effective and efficient service to the public. The balancing

test element "requires the court to consider the context in which the speech was made and the extent to which the speech impaired the efficiency of the workplace." *Stultz v. Va. Dep't Motor Vehicles*, 203 F.Supp.3d 711, 739 (W.D. Va. 2016). The balance of interest weighs heavily in Flanagan's favor because her speech actually aimed to improve the effectiveness and efficiency of the DSS. As Senior Judge Conrad noted, Flanagan "spoke about *aiding*, not hindering DSS's functioning." *Flanagan*, 2020 WL 2754754, at *6 (emphasis added). Accordingly, the court finds that Flanagan has satisfied the second prong of the First Amendment retaliation test.

Scearce argues that Flanagan fails to prove her First Amendment retaliation claim on the third prong—that her speech was a substantial factor in Flanagan's termination. This element requires Flanagan to prove a "causal relationship between the expression of public concern and the retaliatory action." *See Huang v. Bd. of Governors of Univ. of N.C.*, 902 F.2d 1134, 1140 (4th Cir. 1990). This requirement is "rigorous" and requires a plaintiff to "show that 'but for' the protected expression the employer would not have taken the alleged retaliatory action." *Id.* Scearce points to the evidence in the record demonstrating that his concern with Flanagan's management of the DSS and desire to make changes in the management structure of the department predated Flanagan's August 2018 speech to VDSS. Specifically, Scearce highlights his July 17, 2018, speech before the Board of Supervisors in which he asked for a closed session to discuss dissolving the DSS Board and moving management and oversight to a local government official. Scearce argues that this speech, along with the other evidence of Scearce's concerns about DSS, foreclose a finding by any reasonable juror that Flanagan's speech to VDSS was the determinative factor in her termination.

The court finds, however, that the temporal proximity of Flanagan's speech on August 15, 2018, and her termination on August 30, 2018, is sufficient to create a genuine issue of material fact as to whether Flanagan's speech was the but-for cause of her termination. A reasonable juror could conclude, from the short two-week interval between Flanagan's speech and her termination, that Scearce and the board fired Flanagan in retaliation for these public comments. The e-mail Scearce received from Hurt on August 24 referencing Flanagan's trip to Richmond establishes that Scearce knew about this speech prior to Flanagan's termination. Moreover, Hurt's e-mail specifically mentions that, following Flanagan's speech, Virginia Social Services Commissioner Duke Storen wrote a letter "proposing the removal of Supervisor Scearce from the Pittsylvania Social Services Board." A reasonable juror could conclude from these facts that Scearce was motivated to retaliate against Flanagan for giving a speech that criticized his—and the Board of Supervisors'—efforts to undermine and assert direct control over the local DSS, and, relatedly, jeopardized his position on the DSS Board.[12]

Scearce argues that other evidence in the record precludes this finding. Specifically, Scearce points to the speech he gave before the Board of Supervisors on July 17, 2018, where he said, "I have reached my wits end" regarding Flanagan's management of the DSS. (ECF No. 95-1.) But while this speech, and other evidence of Scearce's efforts to undermine and criticize Flanagan in the months leading up to her termination, supports his theory that the Richmond speech was not the deciding factor, the timing and substance of that speech are sufficient to create a genuine issue of material fact on this point. Put simply, although a

---

[12] Indeed, the fact that Flanagan gave her speech to state DSS officials in Richmond who had the authority to take (and later did take) action against Scearce supports this conclusion.

reasonable jury could conclude that Scearce would have fired her anyway, it could also reach the opposite conclusion. Because this third prong is a "question of fact best resolved on 'summary judgment only in those instances when there are no causal facts in dispute[,]'" the court will allow Flanagan's First Amendment retaliation claim to survive the present motion for summary judgment. *Lane*, 660 F. App'x at 191 (quoting *Love-Lane*, 355 F.3d at 776).[13]

### 2.  Fourteenth Amendment Liberty Interest

Flanagan also alleges that Scearce violated her Fourteenth Amendment due process rights by falsely accusing her of corruption in connection with her eventual ouster as DSS director without giving her the opportunity to clear her name. Public employees enjoy a Fourteenth Amendment liberty interest in their "good name, reputation, honor, or integrity" that "is implicated by public announcement of reasons for an employee's discharge." *Sciolino v. City of Newport News*, 480 F.3d 642, 645–46 (4th Cir. 2007). A plaintiff must satisfy two components to show that a governmental employer violated her Fourteenth Amendment rights by publicly disclosing the reasons for her termination. *Cannon v. Vill. of Bald Head Island*, 891 F.3d 489, 501 (4th Cir. 2018). First, the plaintiff must show that she has been deprived of a liberty interest; this is done by demonstrating that the charges made against her by her government employer "(1) placed a stigma on [her] reputation; (2) were made public by the employer; (3) were made in conjunction with [her] termination or demotion; and (4) were false." *Id.* (quoting *Sciolino*, 480 F.3d at 646). Second, the plaintiff must demonstrate that her liberty interest was deprived without due process of law. *Id.* For this component, "notice and

---

[13] As the court has determined that Flanagan has satisfied the first two prongs of this test as a matter of law, at trial, the jury's task will be the narrow one of deciding only the third prong—whether Flanagan's speech two weeks before her firing was the determinative factor in the termination decision.

opportunity to be heard are essential." *Id.* (quoting *Bd. of Regents of State Colls. v. Roth* 408 U.S. 564, 573 (1972)).

Liberty interest claims are narrow, and the Supreme Court "has repeatedly admonished judges to be wary of turning the Due Process Clause into 'a font of tort law' by permitting plaintiffs to constitutionalize state tort claims through artful pleading." *Shirvinski v. U.S. Coast Guard*, 673 F.3d 308, 314 (4th Cir. 2012) (citing *Daniels v. Williams*, 474 U.S. 327, 332 (1986)); *see also Jackson v. Clark*, 564 F. Supp. 2d 483, 489–90 (D. Md. 2008) ("To be sure, Plaintiff's [liberty interest] due process claim is a narrow one, but a cognizable one nonetheless."). A liberty interest claim must therefore be tied to discrete statements made at the time of the adverse employment action. *See, e.g.*, *Paul v. Davis*, 424 U.S. 693, 710 (1976) ("Thus it was not sufficient to establish a claim under § 1983 and the Fourteenth Amendment that there simply be defamation by a state official; the defamation had to occur in the course of the termination of employment.").

As Senior Judge Conrad held in his memorandum opinion denying Scearce's partial motion for summary judgment, Flanagan has established that her reputation was stigmatized because she experienced difficulty securing a new job and could only find a job paying $25,000 less per year than what her position with the Pittsylvania County DSS paid. And for purposes of summary judgment, Scearce also does not challenge that Flanagan has sufficiently shown that the statements were false and that she was denied a hearing and "an opportunity to clear [her] name." *Roth*, 408 U.S. at 573 n.12. Scearce, however, argues that Flanagan has not demonstrated that Scearce was her employer or that he made stigmatizing statements about Flanagan in conjunction with her termination. The court will address each argument in turn.

### a. Employer

Scearce first argues that, as a single member on the DSS Board without the sole authority to bind the board, he was not Flanagan's employer for purposes of her liberty interest claim. The court is not persuaded. At the time of Flanagan's termination, the DSS Board was an Administrative Board, meaning it had authority to appoint Flanagan, review her performance, and terminate her employment. (*See* ECF 101-1 at 22, 25–27.) Although Scearce was only a single member on the seven-member DSS Board, the record shows that he worked directly to nominate board members who would vote to terminate Flanagan and to build public support for that desired outcome.

The record, viewed in the light most favorable to Flanagan, establishes that Scearce directly nominated his "friend" Patricia Evans to sit on the DSS Board in "June or July" of 2018, who shortly thereafter voted to terminate Flanagan in August. (*See* Evans Dep. at 9:14–10:6, 16:19–17:10.) Moreover, Scearce "asked Joe Davis to nominate [Ron] Merricks" to the DSS Board. (Flanagan Dep. at 99:8–12.) After Merricks was nominated to sit on the DSS Board, Scearce sought to set up a meeting with him in July of 2018 to ensure he understood the "complete history of all that has been going on and the opportunity we have on Monday [to] clean the mess up." (ECF No. 101-8 at 6.) As Flanagan points out, a reasonable jury could interpret Scearce's efforts as "trying to network with Mr. Merricks to have him vote in favor of dissolving the [DSS] [B]oard." (Flanagan Dep. at 97:1–98:11.) After Merricks voted against terminating Flanagan, however, he quickly stepped down. Finally, Scearce indicated in an August 12, 2018 Facebook message that he would "still try to get in touch with Andrea [Johnson]," but did not care if he had secured "the votes or not." (ECF No. 101-22 at 2.)

Flanagan has also established that Scearce fueled public opprobrium to facilitate his desired outcome in the months leading up to the termination vote. For example, in a May 3, 2018 e-mail, Scearce told Henry Hurt, "Both you and Vic are doing some outstanding posts." (ECF No. 101-5 at 239.) Scearce then e-mailed Hurt again two days later, stating that, "[Y]ou and Vic have been doing some great posts for the masses. I only wish those posts were moving the other board members in the right direction." (*Id.* at 241.) A reasonable jury could infer that the e-mails reference Hurt's and Ingram's Facebook posts about Flanagan. And in a May 16, 2018 e-mail, Scearce told Hurt that he "might want to put the pressure on Sherry [Flanagan] for the time being." (*Id.* at 27.)

Moreover, Flanagan contends that Scearce encouraged Hurt to hire Ingram to investigate the Pittsylvania County DSS and prepare a report, and the record, when viewed as a whole, supports this conclusion. (Pl.'s Mem. Opp'n Mot. Summ. J. 14 [ECF No. 101].) Finally, at the July 17, 2018 Board of Supervisors meeting, Scearce encouraged the public "to follow the social media accounts of Vic Ingram and Henry Hurt," because they had "detailed almost every allegation [of corruption] that was presented to [Scearce] by interviewing and corroborating directly with the people that had the courage to come forward." (ECF No. 101-6 at 115.)

In sum, when viewed in the light most favorable to Flanagan, the record shows that Scearce coordinated a campaign to tarnish her reputation and, ultimately, terminate her employment. Given his behind-the-scenes efforts and his own role as a voting member, a reasonable jury could therefore conclude that Scearce acted as Flanagan's employer for purposes of her liberty interest claim.

Scearce contends, however, that even if he was Flanagan's employer he is nonetheless protected under the doctrine of qualified immunity because it was not clearly established that a single member of an Administrative Board constitutes an employer for purposes of this liberty interest claim. The court is constrained to agree.

Qualified immunity "protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Stanton v. Sims*, 571 U.S. 3, 5–6 (2013) (cleaned up); *Smith v. Gilchrist*, 749 F.3d 302, 307 (4th Cir. 2014); *Lucas v. Shively*, 31 F. Supp. 3d 800, 810 (W.D. Va. 2014). Evaluating a claim of qualified immunity involves a two-part test: (1) do the allegations underlying the claim, if true, substantiate a violation of a federal statutory or constitutional right; and (2) did the actions violate a clearly established right of which a reasonable person would have known? *Smith v. Munday*, 848 F.3d 248, 260 (4th Cir. 2017); *Durham v. Horner*, 690 F.3d 183, 188 (4th Cir. 2012). As the party asserting qualified immunity, Scearce has the burden of proving the defense. *Meyers v. Balt. Cnty.*, 713 F.3d 723, 731 (4th Cir. 2013) (citing *Wilson v. Kittoe*, 337 F.3d 392, 397 (4th Cir. 2003)).

"For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002) (internal quotation marks and citation omitted). Although it is not required that "the very action in question has previously been held unlawful, . . . in light of pre-existing law the unlawfulness must be apparent." *Id.* (cleaned up). "[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances." *Id.* at 741. Ultimately, "[t]he 'salient question' is whether the state of the law

at the time of the events in question gave the officials 'fair warning' that their conduct was unconstitutional." *Ridpath v. Bd. of Governors Marshall Univ.*, 447 F.3d 292, 313 (4th Cir. 2006).

In this case, Scearce did not have unilateral authority to act on behalf of the DSS Board to terminate Flanagan. *See Bd. of Zoning Appeals v. Caselin Sys.*, 501 S.E.2d 397, 401 (Va. 1998) (finding that Bland County Board of Supervisors chairman could not bind the Board without its approval); *Leachman v. Bd. of Supervisors*, 98 S.E. 656, 658–59 (Va. 1919) ("The chairman of the board and the clerk had no right or power to issue the warrants until the claims had been passed upon by the board."). Scearce instead had to garner support from existing DSS Board members and recruit new members who would vote in favor of terminating Flanagan. The court has been unable to find any binding caselaw from the Supreme Court or the Fourth Circuit holding that a lone member of an administrative board, without authority to bind or act unilaterally for that body, constitutes an employer for purposes of this Fourteenth Amendment liberty-interest claim. *See Booker v. S.C. Dep't of Corr.*, 855 F.3d 533, 538 (4th Cir. 2017) ("In conducting the clearly established analysis, we first examine cases of controlling authority in this jurisdiction, that is, decisions of the Supreme Court, this court of appeals, and the highest court of the state in which the case arose." (cleaned up)). Indeed, in the two leading Fourth Circuit cases recognizing the liberty interest at issue, the defendants were the employing government agency itself and individual government officials who were the recognized agents of those entities. *See Sciolino*, 480 F.3d at 645 (plaintiff, a former city police officer, sued the City of Newport News and the police chief); *Cannon*, 891 F.3d at 493 (plaintiffs, former public-safety officers, sued the Town of Bald Head Island, its town manager, and the director of emergency services).

Accordingly, although the court finds that a reasonable jury could conclude that Scearce was acting as Flanagan's employer for purposes of a liberty-interest claim, it was not clearly established at the time of Flanagan's termination that Scearce, as a lone board member, would be deemed as such and therefore held liable under § 1983. *See, e.g., Turner v. Thomas*, 930 F.3d 640, 645, 646–47 (4th Cir. 2019) (defendants protected by qualified immunity because they lacked "fair warning" that their conduct violated federal law and plaintiff failed to a "allege[] a violation of clearly established law"); *Graves v. Lioi*, 930 F.3d 307, 332–33 (4th Cir. 2019) (defendants entitled to qualified immunity because they lacked "fair warning that their conduct was unconstitutional" and it was accordingly "not clearly established" that their conduct was unlawful). Scearce is therefore protected under the doctrine of qualified immunity.

### b.  Made in Conjunction with Flanagan's Termination

But separate and apart from the court's finding of qualified immunity related to the second *Sciolino* factor, Flanagan has failed to show that Scearce made any stigmatizing statements about her in conjunction with her August 30, 2018 termination. In other words, Flanagan has also failed to establish the third element of her liberty-interest claim.

*Sciolino* itself is not clear as to what "in conjunction" exactly means, but other caselaw suggests that the statements must be made either concurrently or in very close proximity with the termination. In *Hyman v. Town of Plymouth,* for example, the Fourth Circuit held that statements made a little over one month after the plaintiff's termination did not give rise to a liberty-interest claim "because they were made after [the plaintiff] had already been terminated." No. 95-2865, 1996 WL 283318, at *2 (4th Cir. May 30, 1996) (*per curiam*); *see also*

*Siegert v. Gilley*, 500 U.S. 226, 234 (1991) (finding that plaintiff did not state a liberty-interest claim because "[t]he alleged defamation was not uttered incident to [the plaintiff's] termination . . . , since he voluntarily resigned from his position . . . and the letter was written several weeks later").

Moreover, the Second Circuit has concluded that there must be "a concurrent temporal link" between the stigmatizing statements and the plaintiff's termination, ultimately holding that a five-month gap between the statement and termination was too long. *Martz v. Incorporated Village of Valley Stream*, 22 F.3d 26, 32 (2d. Cir. 1994). Both the Eastern District of Virginia and the District of Maryland have quoted *Martz* approvingly and held that a plaintiff must establish a "concurrent temporal link between the defamation and the dismissal" to state a Fourteenth Amendment liberty-interest claim. *Lewis v. Richmond City Sheriff's Office*, No. 3:13cv721-JAG, 2014 WL 2203949, at *5 (E.D. Va. May 27, 2014) (quoting *Martz*, 22 F.3d at 32); *Hamilton v. Mayor & City Council of Balt.*, 807 F. Supp. 2d 331, 357 (D. Md. 2011) (same). Finally, in *Socol v. Albemarle Cnty. Sch. Bd.*, Senior Judge Conrad of this court held that a plaintiff satisfied *Sciolino*'s third prong because he alleged that the defendant "disclosed the information at issue concurrently with, or in close proximity to, the plaintiff's termination." 399 F. Supp. 3d 523, 539 (W.D. Va. 2019).

At bottom, there is simply no evidence of any publicly stigmatizing statements that Scearce made about Flanagan concurrently with or in close proximity to her August 30, 2018 termination. Flanagan points to no specific statement by Scearce in her brief, and after reviewing hundreds of pages of Scearce's Facebook posts, Facebook messages, e-mails, and public comments the court has found only one statement that could possibly support her

claim. As discussed above, at the July 17, 2018, Pittsylvania County Board of Supervisors meeting Scearce spoke about receiving allegations of corruption at the Pittsylvania County DSS and stated:

> If you want to get a clear picture of what those allegations are, I urge you to follow the social media accounts of Vic Ingram and Henry Hurt. Mr. Ingram and Mr. Hurt have detailed almost every allegation that was presented to me by interviewing and corroborating directly with the people that had the courage to come forward.

(ECF No. 101-6 at 115.) Assuming that it was stigmatizing for purposes of a liberty interest claim, Scearce made the statement nearly six weeks *before* Flanagan's August 30, 2018, termination, well beyond what can reasonably constitute "concurrently with, or in close proximity to, the plaintiff's termination." *Socol*, 399 F. Supp. 3d at 539.

Scearce's statements in the months after Flanagan's termination do not support her liberty interest claim either. In October 2018, Scearce posted on his public Facebook page a link to an October 17, 2018, news article and included the following commentary:

> Ms. Flanagan paints a pretty sad picture, I must say. I hope someone from the VDSS board will take a little time to talk to me before they make a decision. I suppose 'a little time' might actually take a day or two if they truly want a clear picture of what has been going on in our local department, but it is ultimately up to them. Regardless, kicking me off of our local board will not stop my efforts to clean our department up. Our citizens, especially those that need it most, deserve better!

(ECF No. 101-6 at 48.) And finally, in a December 26, 2018, *Chatham Star-Tribune* article on Flanagan accepting a new job with the VDSS in Richmond, Scearce is quoted as stating both that, "[f]or them to hire her shows their lack of common sense and lack to [*sic*] manage the state system," that he was "truly appalled," and he would need "to look for the governor to

- 27 -

get involved with this mess. There are children dying on the watch of DSS." *Id.* at 13. These statements were not made in close proximity to Flanagan's termination, but instead months later.[14] *See, e.g.*, *Hyman*, 1996 WL 283318, at *2 (finding that the allegedly defamatory statements did not give rise to a liberty interest claim "because they were made after [the plaintiff] had already been terminated"); *Lewis*, 2014 WL 2203949, at *5 ("The plaintiff must establish a 'concurrent, temporal link between the defamation and the dismissal.'" (quoting *Hamilton*, 807 F. Supp. 2d at 357)). The court has been unable to find any other possibly actionable statements made by Scearce, and Flanagan has not pointed to any.

Although Flanagan is correct that both the Ninth and Tenth Circuits have held that the allegedly defamatory statement need not be exactly contemporaneous with the plaintiff's termination to support a liberty interest claim, the caselaw she cites does not support her position. The Tenth Circuit concluded in *Renaud v. Wyoming Department of Family Services* that "publication of defamatory statements need not be strictly contemporaneous with a termination to occur in the course of the termination of employment," but that case is not helpful to Flanagan because (1) the allegedly defamatory statement was made only four days following the announcement of the plaintiff's termination, and (2) the court ultimately concluded that "the alleged defamation had nothing to do with the reasons for termination . . . ." 203 F.3d 723, 726–27 (10th Cir. 2000). And although the Ninth Circuit in *Campanelli v.*

---

[14] The court also notes that Scearce's later statements were not about her termination, but a state investigation of Scearce's conduct as a board member and his criticism of VDSS for, among other things, hiring Flanagan into a new role. Moreover, the VDSS Board had already suspended Scearce from his position on the Pittsylvania County DSS Board when he was quoted in the *Star-Tribune* article. *See* Halle Parker, *In a 5-3 Vote, State Group Suspends Member from Pittsylvania County DSS Board*, Danville Register & Bee (Dec. 12, 2018), https://godanriver.com/news/pittsylvania_county/in-a-5-3-vote-state-group-suspends-member-from-pittsylvania-county-dss-board/article_d955d1be-fe4d-11e8-8fbf-6ffe83397599.html (last visited Aug. 20, 2021).

*Bockrath* similarly refused to adopt a bright-line rule that defamatory statements made after the plaintiff's termination could not support a liberty-interest claim, only a "seven- to nine-day interval between the termination date and the publication of the defendant's statements" existed. 100 F.3d 1476, 1482–82 (9th Cir. 1996). Scearce's statements in October and December 2018 were far outside these relaxed temporal limits.

Likely recognizing that Scearce's statements do not carry her burden, Flanagan argues that various statements made by her other public critics—specifically Ingram and Hurt—should be imputed to Scearce for purposes of satisfying this element. In support of this attenuated theory, Flanagan points out that two DSS Board members testified that they voted to terminate Flanagan because of both the Ingram Report "done at Mr. Scearce's behest" and the hostile work allegations Scearce had raised against Flanagan. (Pl.'s Mem. Opp'n Mot. Summ. J. 20 [ECF No. 101].) She contends that Scearce "recruited Mr. Hurt and Mr. Ingram to embark on his smear campaign against Ms. Flanagan," and that his "use of Mr. Hurt and Mr. Ingram in his grand smear campaign imputes liability on Mr. Scearce." (*Id.* at 22.)

The court does not agree. First, the court has been unable to identify any Fourth Circuit liberty interest precedent holding a government official personally liable for statements made by private citizens wholly removed from the decision to terminate government employment. But even assuming that critical or defamatory statements made by others could be imputed to a government employer, Flanagan still fails to point to any actionable public statements of Hurt or Ingram that were made at the time of her termination. While both men were certainly critical of Flanagan in the months leading up to her ouster, the record is devoid of any public statements they made in the days leading up to or immediately following her termination

discussing the purported reasons for that termination. Had Scearce reached out to Hurt or Ingram either on or within a few days of Flanagan's termination and encouraged them to broadcast on social and traditional media about her firing and the purported reasons for it, this would be a closer case. But that did not happen here, and Hurt's and Ingram's critical statements in the months before the DSS Board voted to terminate Flanagan—even if they could be imputed to Scearce because he encouraged and supported them—are too far removed, both temporally and substantively, to satisfy the third element of a liberty interest claim. In sum, Flanagan has also failed to demonstrate Scearce made a defamatory statement about her in conjunction with her termination.

## IV.   CONCLUSION

For these reasons, the court will grant summary judgment to Scearce with respect to Flanagan's Fourteenth Amendment liberty-interest claims and all claims against Scearce in his official capacity as a DSS Board member. The court will deny Scearce's motion for summary judgment as to Flanagan's First Amendment retaliatory discharge claim. That claim will be tried to a jury.

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 23 day of August, 2021.


*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE